## KOREMATSU *v.* UNITED STATES.

No. 22. Argued October 11, 12, 1944.—Decided December 18, 1944.

*Messrs. Wayne M. Collins* and *Charles A. Horsky* argued the cause, and *Mr. Collins* was on the brief, for petitioner.

*Solicitor General Fahy,* with whom *Assistant Attorney General Wechsler* and *Messrs. Edward J. Ennis, Ralph F. Fuchs,* and *John L. Burling* were on the brief, for the United States.

*Messrs. Saburo Kido* and *A. L. Wirin* filed a brief on behalf of the Japanese American Citizens League; and *Messrs. Edwin Borchard, Charles A. Horsky, George Rublee, Arthur DeHon Hill, Winthrop Wadleigh, Osmond K. Fraenkel, Harold Evans, William Draper Lewis,* and *Thomas Raeburn White* on behalf of the American Civil Liberties Union, as *amici curiae,* in support of petitioner.

*Messrs. Robert W. Kenney,* Attorney General of California, *George Neuner,* Attorney General of Oregon, *Smith Troy,* Attorney General of Washington, and *Fred E. Lewis,* Acting Attorney General of Washington, filed a brief on behalf of the States of California, Oregon and Washington, as *amici curiae,* in support of the United States.

MR. JUSTICE BLACK delivered the opinion of the Court.

The petitioner, an American citizen of Japanese descent, was convicted in a federal district court for remaining in San Leandro, California, a "Military Area," contrary to Civilian Exclusion Order No. 34 of the Commanding Gen-

eral of the Western Command, U. S. Army, which directed that after May 9, 1942, all persons of Japanese ancestry should be excluded from that area. No question was raised as to petitioner's loyalty to the United States. The Circuit Court of Appeals affirmed,[1] and the importance of the constitutional question involved caused us to grant certiorari.

It should be noted, to begin with, that all legal restrictions which curtail the civil rights of a single racial group are immediately suspect. That is not to say that all such restrictions are unconstitutional. It is to say that courts must subject them to the most rigid scrutiny. Pressing public necessity may sometimes justify the existence of such restrictions; racial antagonism never can.

In the instant case prosecution of the petitioner was begun by information charging violation of an Act of Congress, of March 21, 1942, 56 Stat. 173, which provides that

". . . whoever shall enter, remain in, leave, or commit any act in any military area or military zone prescribed, under the authority of an Executive order of the President, by the Secretary of War, or by any military commander designated by the Secretary of War, contrary to the restrictions applicable to any such area or zone or contrary to the order of the Secretary of War or any such military commander, shall, if it appears that he knew or should have known of the existence and extent of the restrictions or order and that his act was in violation thereof, be guilty of a misdemeanor and upon conviction shall be liable to a fine of not to exceed $5,000 or to imprisonment for not more than one year, or both, for each offense."

Exclusion Order No. 34, which the petitioner knowingly and admittedly violated, was one of a number of military orders and proclamations, all of which were sub-

---

[1] 140 F. 2d 289.

stantially based upon Executive Order No. 9066, 7 Fed. Reg. 1407. That order, issued after we were at war with Japan, declared that "the successful prosecution of the war requires every possible protection against espionage and against sabotage to national-defense material, national-defense premises, and national-defense utilities. . . ."

One of the series of orders and proclamations, a curfew order, which like the exclusion order here was promulgated pursuant to Executive Order 9066, subjected all persons of Japanese ancestry in prescribed West Coast military areas to remain in their residences from 8 p. m. to 6 a. m. As is the case with the exclusion order here, that prior curfew order was designed as a "protection against espionage and against sabotage." In *Hirabayashi* v. *United States,* 320 U. S. 81, we sustained a conviction obtained for violation of the curfew order. The Hirabayashi conviction and this one thus rest on the same 1942 Congressional Act and the same basic executive and military orders, all of which orders were aimed at the twin dangers of espionage and sabotage.

The 1942 Act was attacked in the *Hirabayashi* case as an unconstitutional delegation of power; it was contended that the curfew order and other orders on which it rested were beyond the war powers of the Congress, the military authorities and of the President, as Commander in Chief of the Army; and finally that to apply the curfew order against none but citizens of Japanese ancestry amounted to a constitutionally prohibited discrimination solely on account of race. To these questions, we gave the serious consideration which their importance justified. We upheld the curfew order as an exercise of the power of the government to take steps necessary to prevent espionage and sabotage in an area threatened by Japanese attack.

In the light of the principles we announced in the *Hirabayashi* case, we are unable to conclude that it was beyond the war power of Congress and the Executive to exclude

those of Japanese ancestry from the West Coast war area at the time they did. True, exclusion from the area in which one's home is located is a far greater deprivation than constant confinement to the home from 8 p. m. to 6 a. m. Nothing short of apprehension by the proper military authorities of the gravest imminent danger to the public safety can constitutionally justify either. But exclusion from a threatened area, no less than curfew, has a definite and close relationship to the prevention of espionage and sabotage. The military authorities, charged with the primary responsibility of defending our shores, concluded that curfew provided inadequate protection and ordered exclusion. They did so, as pointed out in our *Hirabayashi* opinion, in accordance with Congressional authority to the military to say who should, and who should not, remain in the threatened areas.

In this case the petitioner challenges the assumptions upon which we rested our conclusions in the *Hirabayashi* case. He also urges that by May 1942, when Order No. 34 was promulgated, all danger of Japanese invasion of the West Coast had disappeared. After careful consideration of these contentions we are compelled to reject them.

Here, as in the *Hirabayashi* case, *supra,* at p. 99, ". . . we cannot reject as unfounded the judgment of the military authorities and of Congress that there were disloyal members of that population, whose number and strength could not be precisely and quickly ascertained. We cannot say that the war-making branches of the Government did not have ground for believing that in a critical hour such persons could not readily be isolated and separately dealt with, and constituted a menace to the national defense and safety, which demanded that prompt and adequate measures be taken to guard against it."

Like curfew, exclusion of those of Japanese origin was deemed necessary because of the presence of an unascertained number of disloyal members of the group, most of

whom we have no doubt were loyal to this country. It was because we could not reject the finding of the military authorities that it was impossible to bring about an immediate segregation of the disloyal from the loyal that we sustained the validity of the curfew order as applying to the whole group. In the instant case, temporary exclusion of the entire group was rested by the military on the same ground. The judgment that exclusion of the whole group was for the same reason a military imperative answers the contention that the exclusion was in the nature of group punishment based on antagonism to those of Japanese origin. That there were members of the group who retained loyalties to Japan has been confirmed by investigations made subsequent to the exclusion. Approximately five thousand American citizens of Japanese ancestry refused to swear unqualified allegiance to the United States and to renounce allegiance to the Japanese Emperor, and several thousand evacuees requested repatriation to Japan.[2]

We uphold the exclusion order as of the time it was made and when the petitioner violated it. Cf. *Chastleton Corporation* v. *Sinclair*, 264 U. S. 543, 547; *Block* v. *Hirsh*, 256 U. S. 135, 154–5. In doing so, we are not unmindful of the hardships imposed by it upon a large group of American citizens. Cf. *Ex parte Kawato*, 317 U. S. 69, 73. But hardships are part of war, and war is an aggregation of hardships. All citizens alike, both in and out of uniform, feel the impact of war in greater or lesser measure. Citizenship has its responsibilities as well as its privileges, and in time of war the burden is always heavier. Compulsory

---

[2] Hearings before the Subcommittee on the National War Agencies Appropriation Bill for 1945, Part II, 608–726; Final Report, Japanese Evacuation from the West Coast, 1942, 309–327; Hearings before the Committee on Immigration and Naturalization, House of Representatives, 78th Cong., 2d Sess., on H. R. 2701 and other bills to expatriate certain nationals of the United States, pp. 37–42, 49–58.

exclusion of large groups of citizens from their homes, except under circumstances of direst emergency and peril, is inconsistent with our basic governmental institutions. But when under conditions of modern warfare our shores are threatened by hostile forces, the power to protect must be commensurate with the threatened danger.

It is argued that on May 30, 1942, the date the petitioner was charged with remaining in the prohibited area, there were conflicting orders outstanding, forbidding him both to leave the area and to remain there. Of course, a person cannot be convicted for doing the very thing which it is a crime to fail to do. But the outstanding orders here contained no such contradictory commands.

There was an order issued March 27, 1942, which prohibited petitioner and others of Japanese ancestry from leaving the area, but its effect was specifically limited in time "until and to the extent that a future proclamation or order should so permit or direct." 7 Fed. Reg. 2601. That "future order," the one for violation of which petitioner was convicted, was issued May 3, 1942, and it did "direct" exclusion from the area of all persons of Japanese ancestry, before 12 o'clock noon, May 9; furthermore it contained a warning that all such persons found in the prohibited area would be liable to punishment under the March 21, 1942 Act of Congress. Consequently, the only order in effect touching the petitioner's being in the area on May 30, 1942, the date specified in the information against him, was the May 3 order which prohibited his remaining there, and it was that same order, which he stipulated in his trial that he had violated, knowing of its existence. There is therefore no basis for the argument that on May 30, 1942, he was subject to punishment, under the March 27 and May 3 orders, whether he remained in or left the area.

It does appear, however, that on May 9, the effective date of the exclusion order, the military authorities had

already determined that the evacuation should be effected by assembling together and placing under guard all those of Japanese ancestry, at central points, designated as "assembly centers," in order "to insure the orderly evacuation and resettlement of Japanese voluntarily migrating from Military Area No. 1, to restrict and regulate such migration." Public Proclamation No. 4, 7 Fed. Reg. 2601. And on May 19, 1942, eleven days before the time petitioner was charged with unlawfully remaining in the area, Civilian Restrictive Order No. 1, 8 Fed. Reg. 982, provided for detention of those of Japanese ancestry in assembly or relocation centers. It is now argued that the validity of the exclusion order cannot be considered apart from the orders requiring him, after departure from the area, to report and to remain in an assembly or relocation center. The contention is that we must treat these separate orders as one and inseparable; that, for this reason, if detention in the assembly or relocation center would have illegally deprived the petitioner of his liberty, the exclusion order and his conviction under it cannot stand.

We are thus being asked to pass at this time upon the whole subsequent detention program in both assembly and relocation centers, although the only issues framed at the trial related to petitioner's remaining in the prohibited area in violation of the exclusion order. Had petitioner here left the prohibited area and gone to an assembly center we cannot say either as a matter of fact or law that his presence in that center would have resulted in his detention in a relocation center. Some who did report to the assembly center were not sent to relocation centers, but were released upon condition that they remain outside the prohibited zone until the military orders were modified or lifted. This illustrates that they pose different problems and may be governed by different principles. The lawfulness of one does not necessarily determine the lawfulness of the others. This is made clear

when we analyze the requirements of the separate provisions of the separate orders. These separate requirements were that those of Japanese ancestry (1) depart from the area; (2) report to and temporarily remain in an assembly center; (3) go under military control to a relocation center there to remain for an indeterminate period until released conditionally or unconditionally by the military authorities. Each of these requirements, it will be noted, imposed distinct duties in connection with the separate steps in a complete evacuation program. Had Congress directly incorporated into one Act the language of these separate orders, and provided sanctions for their violations, disobedience of any one would have constituted a separate offense. Cf. *Blockburger* v. *United States*, 284 U. S. 299, 304. There is no reason why violations of these orders, insofar as they were promulgated pursuant to Congressional enactment, should not be treated as separate offenses.

The *Endo* case, *post*, p. 283, graphically illustrates the difference between the validity of an order to exclude and the validity of a detention order after exclusion has been effected.

Since the petitioner has not been convicted of failing to report or to remain in an assembly or relocation center, we cannot in this case determine the validity of those separate provisions of the order. It is sufficient here for us to pass upon the order which petitioner violated. To do more would be to go beyond the issues raised, and to decide momentous questions not contained within the framework of the pleadings or the evidence in this case. It will be time enough to decide the serious constitutional issues which petitioner seeks to raise when an assembly or relocation order is applied or is certain to be applied to him, and we have its terms before us.

Some of the members of the Court are of the view that evacuation and detention in an Assembly Center were inseparable. After May 3, 1942, the date of Exclusion

Order No. 34, Korematsu was under compulsion to leave the area not as he would choose but via an Assembly Center. The Assembly Center was conceived as a part of the machinery for group evacuation. The power to exclude includes the power to do it by force if necessary. And any forcible measure must necessarily entail some degree of detention or restraint whatever method of removal is selected. But whichever view is taken, it results in holding that the order under which petitioner was convicted was valid.

It is said that we are dealing here with the case of imprisonment of a citizen in a concentration camp solely because of his ancestry, without evidence or inquiry concerning his loyalty and good disposition towards the United States. Our task would be simple, our duty clear, were this a case involving the imprisonment of a loyal citizen in a concentration camp because of racial prejudice. Regardless of the true nature of the assembly and relocation centers—and we deem it unjustifiable to call them concentration camps with all the ugly connotations that term implies—we are dealing specifically with nothing but an exclusion order. To cast this case into outlines of racial prejudice, without reference to the real military dangers which were presented, merely confuses the issue. Korematsu was not excluded from the Military Area because of hostility to him or his race. He *was* excluded because we are at war with the Japanese Empire, because the properly constituted military authorities feared an invasion of our West Coast and felt constrained to take proper security measures, because they decided that the military urgency of the situation demanded that all citizens of Japanese ancestry be segregated from the West Coast temporarily, and finally, because Congress, reposing its confidence in this time of war in our military leaders—as inevitably it must—determined that they should have the power to do just this. There was evidence of disloyalty on the part of some, the military authorities considered that the need for

action was great, and time was short. We cannot—by availing ourselves of the calm perspective of hindsight—now say that at that time these actions were unjustified.

*Affirmed.*

MR. JUSTICE FRANKFURTER, concurring.

According to my reading of Civilian Exclusion Order No. 34, it was an offense for Korematsu to be found in Military Area No. 1, the territory wherein he was previously living, except within the bounds of the established Assembly Center of that area. Even though the various orders issued by General DeWitt be deemed a comprehensive code of instructions, their tenor is clear and not contradictory. They put upon Korematsu the obligation to leave Military Area No. 1, but only by the method prescribed in the instructions, *i. e.*, by reporting to the Assembly Center. I am unable to see how the legal considerations that led to the decision in *Hirabayashi* v. *United States*, 320 U. S. 81, fail to sustain the military order which made the conduct now in controversy a crime. And so I join in the opinion of the Court, but should like to add a few words of my own.

The provisions of the Constitution which confer on the Congress and the President powers to enable this country to wage war are as much part of the Constitution as provisions looking to a nation at peace. And we have had recent occasion to quote approvingly the statement of former Chief Justice Hughes that the war power of the Government is "the power to wage war successfully." *Hirabayashi* v. *United States, supra* at 93; and see *Home Bldg. & L. Assn.* v. *Blaisdell,* 290 U. S. 398, 426. Therefore, the validity of action under the war power must be judged wholly in the context of war. That action is not to be stigmatized as lawless because like action in times of peace would be lawless. To talk about a military order that expresses an allowable judgment of war needs by those entrusted with the duty of conducting war as "an

unconstitutional order" is to suffuse a part of the Constitution with an atmosphere of unconstitutionality. The respective spheres of action of military authorities and of judges are of course very different. But within their sphere, military authorities are no more outside the bounds of obedience to the Constitution than are judges within theirs. "The war power of the United States, like its other powers . . . is subject to applicable constitutional limitations", *Hamilton* v. *Kentucky Distilleries Co.*, 251 U. S. 146,.156. To recognize that military orders are "reasonably expedient military precautions" in time of war and yet to deny them constitutional legitimacy makes of the Constitution an instrument for dialectic subleties not reasonably to be attributed to the hard-headed Framers, of whom a majority had had actual participation in war. If a military order such as that under review does not transcend the means appropriate for conducting war, such action by the military is as constitutional as would be any authorized action by the Interstate Commerce Commission within the limits of the constitutional power to regulate commerce. And being an exercise of the war power explicitly granted by the Constitution for safeguarding the national life by prosecuting war effectively, I find nothing in the Constitution which denies to Congress the power to enforce such a valid military order by making its violation an offense triable in the civil courts. Compare *Interstate Commerce Commission* v. *Brimson*, 154 U. S. 447; 155 U. S. 3, and *Monongahela Bridge Co.* v. *United States*, 216 U. S. 177. To find that the Constitution does not forbid the military measures now complained of does not carry with it approval of that which Congress and the Executive did. That is their business, not ours.

Mr. Justice Roberts.

I dissent, because I think the indisputable facts exhibit a clear violation of Constitutional rights.

This is not a case of keeping people off the streets at night as was *Hirabayashi* v. *United States*, 320 U. S. 81,

nor a case of temporary exclusion of a citizen from an area for his own safety or that of the community, nor a case of offering him an opportunity to go temporarily out of an area where his presence might cause danger to himself or to his fellows. On the contrary, it is the case of convicting a citizen as a punishment for not submitting to imprisonment in a concentration camp, based on his ancestry, and solely because of his ancestry, without evidence or inquiry concerning his loyalty and good disposition towards the United States. If this be a correct statement of the facts disclosed by this record, and facts of which we take judicial notice, I need hardly labor the conclusion that Constitutional rights have been violated.

The Government's argument, and the opinion of the court, in my judgment, erroneously divide that which is single and indivisible and thus make the case appear as if the petitioner violated a Military Order, sanctioned by Act of Congress, which excluded him from his home, by refusing voluntarily to leave and, so, knowingly and intentionally, defying the order and the Act of Congress.

The petitioner, a resident of San Leandro, Alameda County, California, is a native of the United States of Japanese ancestry who, according to the uncontradicted evidence, is a loyal citizen of the nation.

A chronological recitation of events will make it plain that the petitioner's supposed offense did not, in truth, consist in his refusal voluntarily to leave the area which included his home in obedience to the order excluding him therefrom. Critical attention must be given to the dates and sequence of events.

December 8, 1941, the United States declared war on Japan.

February 19, 1942, the President issued Executive Order No. 9066,[1] which, after stating the reason for issuing the

---

[1] 7 Fed. Reg. 1407.

order as "protection against espionage and against sabotage to national-defense material, national-defense premises, and national-defense utilities," provided that certain Military Commanders might, in their discretion, "prescribe military areas" and define their extent, "from which any or all persons may be excluded, and with respect to which the right of any person to enter, remain in, or leave shall be subject to whatever restrictions" the "Military Commander may impose in his discretion."

February 20, 1942, Lieutenant General DeWitt was designated Military Commander of the Western Defense Command embracing the westernmost states of the Union,—about one-fourth of the total area of the nation.

March 2, 1942, General DeWitt promulgated Public Proclamation No. 1,[2] which recites that the entire Pacific Coast is "particularly subject to attack, to attempted invasion . . . and, in connection therewith, is subject to espionage and acts of sabotage." It states that "as a matter of military necessity" certain military areas and zones are established known as Military Areas Nos. 1 and 2. It adds that "Such persons or classes of persons as the situation may require" will, by subsequent orders, "be excluded from all of Military Area No. 1" and from certain zones in Military Area No. 2. Subsequent proclamations were made which, together with Proclamation No. 1, included in such areas and zones all of California, Washington, Oregon, Idaho, Montana, Nevada and Utah, and the southern portion of Arizona. The orders required that if any person of Japanese, German or Italian ancestry residing in Area No. 1 desired to change his habitual residence he must execute and deliver to the authorities a Change of Residence Notice.

San Leandro, the city of petitioner's residence, lies in Military Area No. 1.

---

[2] 7 Fed. Reg. 2320.

On March 2, 1942, the petitioner, therefore, had notice that, by Executive Order, the President, to prevent espionage and sabotage, had authorized the Military to exclude him from certain areas and to prevent his entering or leaving certain areas without permission. He was on notice that his home city had been included, by Military Order, in Area No. 1, and he was on notice further that, at sometime in the future, the Military Commander would make an order for the exclusion of certain persons, not described or classified, from various zones including that in which he lived.

March 21, 1942, Congress enacted[3] that anyone who knowingly "shall enter, remain in, leave, or commit any act in any military area or military zone prescribed . . . by any military commander . . . contrary to the restrictions applicable to any such area or zone or contrary to the order of . . . any such military commander" shall be guilty of a misdemeanor. This is the Act under which the petitioner was charged.

March 24, 1942, General DeWitt instituted the curfew for certain areas within his command, by an order the validity of which was sustained in *Hirabayashi* v. *United States, supra.*

March 24, 1942, General DeWitt began to issue a series of exclusion orders relating to specified areas.

March 27, 1942, by Proclamation No. 4,[4] the General recited that "it is necessary, in order to provide for the welfare and to insure the orderly evacuation and resettlement of Japanese *voluntarily migrating* from Military Area No. 1, to restrict and regulate such migration"; and ordered that, as of March 29, 1942, "all alien Japanese and persons of Japanese ancestry who are within the limits of Military Area No. 1, be and they are hereby

[3] 56 Stat. 173.
[4] 7 Fed. Reg. 2601.

prohibited from leaving that area for any purpose until and to the extent that a future proclamation or order of this headquarters shall so permit or direct." [5]

No order had been made excluding the petitioner from the area in which he lived. By Proclamation No. 4 he was, after March 29, 1942, confined to the limits of Area No. 1. If the Executive Order No. 9066 and the Act of Congress meant what they said, to leave that area, in the face of Proclamation No. 4, would be to commit a misdemeanor.

May 3, 1942, General DeWitt issued Civilian Exclusion Order No. 34 [6] providing that, after 12 o'clock May 8, 1942, all persons of Japanese ancestry, both alien and non-alien, were to be excluded from a described portion of Military Area No. 1, which included the County of Alameda, California. The order required a responsible member of each family and each individual living alone to report, at a time set, at a Civil Control Station for instructions to go to an Assembly Center, and added that any person failing to comply with the provisions of the order who was found in the described area after the date set would be liable to prosecution under the Act of March 21, 1942, *supra*. It is important to note that the order, by its express terms, had no application to persons within the bounds "of an established Assembly Center pursuant to instructions from this Headquarters . . ." The obvious purpose of the orders made, taken together, was to drive all citizens of Japanese ancestry into Assembly Centers within the zones of their residence, under pain of criminal prosecution.

---

[5] The italics in the quotation are mine. The use of the word "voluntarily" exhibits a grim irony probably not lost on petitioner and others in like case. Either so, or its use was a disingenuous attempt to camouflage the compulsion which was to be applied.

[6] 7 Fed. Reg. 3967.

The predicament in which the petitioner thus found himself was this: He was forbidden, by Military Order, to leave the zone in which he lived; he was forbidden, by Military Order, after a date fixed, to be found within that zone unless he were in an Assembly Center located in that zone. General DeWitt's report to the Secretary of War concerning the programme of evacuation and relocation of Japanese makes it entirely clear, if it were necessary to refer to that document,—and, in the light of the above recitation, I think it is not,—that an Assembly Center was a euphemism for a prison. No person within such a center was permitted to leave except by Military Order.

In the dilemma that he dare not remain in his home, or voluntarily leave the area, without incurring criminal penalties, and that the only way he could avoid punishment was to go to an Assembly Center and submit himself to military imprisonment, the petitioner did nothing.

June 12, 1942, an Information was filed in the District Court for Northern California charging a violation of the Act of March 21, 1942, in that petitioner had knowingly remained within the area covered by Exclusion Order No. 34. A demurrer to the information having been overruled, the petitioner was tried under a plea of not guilty and convicted. Sentence was suspended and he was placed on probation for five years. We know, however, in the light of the foregoing recitation, that he was at once taken into military custody and lodged in an Assembly Center. We further know that, on March 18, 1942, the President had promulgated Executive Order No. 9102 [7] establishing the War Relocation Authority under which so-called Relocation Centers, a euphemism for concentration camps, were established pursuant to cooperation between the military authorities of the Western Defense Command and the Relocation Authority, and that the petitioner has

[7] 7 Fed. Reg. 2165.

been confined either in an Assembly Center, within the zone in which he had lived or has been removed to a Relocation Center where, as the facts disclosed in *Ex parte Endo* (*post*, p. 283) demonstrate, he was illegally held in custody.

The Government has argued this case as if the only order outstanding at the time the petitioner was arrested and informed against was Exclusion Order No. 34 ordering him to leave the area in which he resided, which was the basis of the information against him. That argument has evidently been effective. The opinion refers to the *Hirabayashi* case, *supra*, to show that this court has sustained the validity of a curfew order in an emergency. The argument then is that exclusion from a given area of danger, while somewhat more sweeping than a curfew regulation, is of the same nature,—a temporary expedient made necessary by a sudden emergency. This, I think, is a substitution of an hypothetical case for the case actually before the court. I might agree with the court's disposition of the hypothetical case.[8] The liberty of every American citizen freely to come and to go must frequently, in the face of sudden danger, be temporarily limited or suspended. The civil authorities must often resort to the expedient of excluding citizens temporarily from a locality. The drawing of fire lines in the case of a conflagration, the removal of persons from the area where a pestilence has broken out, are familiar examples. If the exclusion worked by Exclusion Order No. 34 were of that nature the *Hirabayashi* case would be authority for sustaining it.

---

[8] My agreement would depend on the definition and application of the terms "temporary" and "emergency." No pronouncement of the commanding officer can, in my view, preclude judicial inquiry and determination whether an emergency ever existed and whether, if so, it remained, at the date of the restraint out of which the litigation arose. Cf. *Chastleton Corp.* v. *Sinclair*, 264 U. S. 543.

But the facts above recited, and those set forth in *Ex parte Endo, supra,* show that the exclusion was but a part of an over-all plan for forceable detention. This case cannot, therefore, be decided on any such narrow ground as the possible validity of a Temporary Exclusion Order under which the residents of an area are given an opportunity to leave and go elsewhere in their native land outside the boundaries of a military area. To make the case turn on any such assumption is to shut our eyes to reality.

As I have said above, the petitioner, prior to his arrest, was faced with two diametrically contradictory orders given sanction by the Act of Congress of March 21, 1942. The earlier of those orders made him a criminal if he left the zone in which he resided; the later made him a criminal if he did not leave.

I had supposed that if a citizen was constrained by two laws, or two orders having the force of law, and obedience to one would violate the other, to punish him for violation of either would deny him due process of law. And I had supposed that under these circumstances a conviction for violating one of the orders could not stand.

We cannot shut our eyes to the fact that had the petitioner attempted to violate Proclamation No. 4 and leave the military area in which he lived he would have been arrested and tried and convicted for violation of Proclamation No. 4. The two conflicting orders, one which commanded him to stay and the other which commanded him to go, were nothing but a cleverly devised trap to accomplish the real purpose of the military authority, which was to lock him up in a concentration camp. The only course by which the petitioner could avoid arrest and prosecution was to go to that camp according to instructions to be given him when he reported at a Civil Control Center. We know that is the fact. Why should we set up a figmentary and artificial situation instead of addressing ourselves to the actualities of the case?

These stark realities are met by the suggestion that it is lawful to compel an American citizen to submit to illegal imprisonment on the assumption that he might, after going to the Assembly Center, apply for his discharge by suing out a writ of habeas corpus, as was done in the *Endo* case, *supra*. The answer, of course, is that where he was subject to two conflicting laws he was not bound, in order to escape violation of one or the other, to surrender his liberty for any period. Nor will it do to say that the detention was a necessary part of the process of evacuation, and so we are here concerned only with the validity of the latter.

Again it is a new doctrine of constitutional law that one indicted for disobedience to an unconstitutional statute may not defend on the ground of the invalidity of the statute but must obey it though he knows it is no law and, after he has suffered the disgrace of conviction and lost his liberty by sentence, then, and not before, seek, from within prison walls, to test the validity of the law.

Moreover, it is beside the point to rest decision in part on the fact that the petitioner, for his own reasons, wished to remain in his home. If, as is the fact, he was constrained so to do, it is indeed a narrow application of constitutional rights to ignore the order which constrained him, in order to sustain his conviction for violation of another contradictory order.

I would reverse the judgment of conviction.

MR. JUSTICE MURPHY, dissenting.

This exclusion of "all persons of Japanese ancestry, both alien and non-alien," from the Pacific Coast area on a plea of military necessity in the absence of martial law ought not to be approved. Such exclusion goes over "the very brink of constitutional power" and falls into the ugly abyss of racism.

In dealing with matters relating to the prosecution and progress of a war, we must accord great respect and con-

sideration to the judgments of the military authorities who are on the scene and who have full knowledge of the military facts. The scope of their discretion must, as a matter of necessity and common sense, be wide. And their judgments ought not to be overruled lightly by those whose training and duties ill-equip them to deal intelligently with matters so vital to the physical security of the nation.

At the same time, however, it is essential that there be definite limits to military discretion, especially where martial law has not been declared. Individuals must not be left impoverished of their constitutional rights on a plea of military necessity that has neither substance nor support. Thus, like other claims conflicting with the asserted constitutional rights of the individual, the military claim must subject itself to the judicial process of having its reasonableness determined and its conflicts with other interests reconciled. "What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions." *Sterling* v. *Constantin*, 287 U. S. 378, 401.

The judicial test of whether the Government, on a plea of military necessity, can validly deprive an individual of any of his constitutional rights is whether the deprivation is reasonably related to a public danger that is so "immediate, imminent, and impending" as not to admit of delay and not to permit the intervention of ordinary constitutional processes to alleviate the danger. *United States* v. *Russell*, 13 Wall. 623, 627–8; *Mitchell* v. *Harmony*, 13 How. 115, 134–5; *Raymond* v. *Thomas*, 91 U. S. 712, 716. Civilian Exclusion Order No. 34, banishing from a prescribed area of the Pacific Coast "all persons of Japanese ancestry, both alien and non-alien," clearly does not meet that test. Being an obvious racial discrimination, the

order deprives all those within its scope of the equal protection of the laws as guaranteed by the Fifth Amendment. It further deprives these individuals of their constitutional rights to live and work where they will, to establish a home where they choose and to move about freely. In excommunicating them without benefit of hearings, this order also deprives them of all their constitutional rights to procedural due process. Yet no reasonable relation to an "immediate, imminent, and impending" public danger is evident to support this racial restriction which is one of the most sweeping and complete deprivations of constitutional rights in the history of this nation in the absence of martial law.

It must be conceded that the military and naval situation in the spring of 1942 was such as to generate a very real fear of invasion of the Pacific Coast, accompanied by fears of sabotage and espionage in that area. The military command was therefore justified in adopting all reasonable means necessary to combat these dangers. In adjudging the military action taken in light of the then apparent dangers, we must not erect too high or too meticulous standards; it is necessary only that the action have some reasonable relation to the removal of the dangers of invasion, sabotage and espionage. But the exclusion, either temporarily or permanently, of all persons with Japanese blood in their veins has no such reasonable relation. And that relation is lacking because the exclusion order necessarily must rely for its reasonableness upon the assumption that *all* persons of Japanese ancestry may have a dangerous tendency to commit sabotage and espionage and to aid our Japanese enemy in other ways. It is difficult to believe that reason, logic or experience could be marshalled in support of such an assumption.

That this forced exclusion was the result in good measure of this erroneous assumption of racial guilt rather than

bona fide military necessity is evidenced by the Commanding General's Final Report on the evacuation from the Pacific Coast area.[1] In it he refers to all individuals of Japanese descent as "subversive," as belonging to "an enemy race" whose "racial strains are undiluted," and as constituting "over 112,000 potential enemies . . . at large today" along the Pacific Coast.[2] In support of this blanket condemnation of all persons of Japanese descent, however, no reliable evidence is cited to show that such individuals were generally disloyal,[3] or had generally so conducted themselves in this area as to constitute a special menace to defense installations or war industries, or had otherwise by their behavior furnished reasonable ground for their exclusion as a group.

Justification for the exclusion is sought, instead, mainly upon questionable racial and sociological grounds not

---

[1] Final Report, Japanese Evacuation from the West Coast, 1942, by Lt. Gen. J. L. DeWitt. This report is dated June 5, 1943, but was not made public until January, 1944.

[2] Further evidence of the Commanding General's attitude toward individuals of Japanese ancestry is revealed in his voluntary testimony on April 13, 1943, in San Francisco before the House Naval Affairs Subcommittee to Investigate Congested Areas, Part 3, pp. 739–40 (78th Cong., 1st Sess.):

"I don't want any of them [persons of Japanese ancestry] here. They are a dangerous element. There is no way to determine their loyalty. The west coast contains too many vital installations essential to the defense of the country to allow any Japanese on this coast. . . . The danger of the Japanese was, and is now—if they are permitted to come back—espionage and sabotage. It makes no difference whether he is an American citizen, he is still a Japanese. American citizenship does not necessarily determine loyalty. . . . But we must worry about the Japanese all the time until he is wiped off the map. Sabotage and espionage will make problems as long as he is allowed in this area. . . ."

[3] The Final Report, p. 9, casts a cloud of suspicion over the entire group by saying that "while it was *believed* that *some* were loyal, it was known that many were not." (Italics added.)

ordinarily within the realm of expert military judgment, supplemented by certain semi-military conclusions drawn from an unwarranted use of circumstantial evidence. Individuals of Japanese ancestry are condemned because they are said to be "a large, unassimilated, tightly knit racial group, bound to an enemy nation by strong ties of race, culture, custom and religion."[4] They are claimed to be given to "emperor worshipping ceremonies"[5] and to "dual citizenship."[6] Japanese language schools and allegedly pro-Japanese organizations are cited as evidence of possible group disloyalty,[7] together with facts as to

[4] Final Report, p. vii; see also pp. 9, 17. To the extent that assimilation is a problem, it is largely the result of certain social customs and laws of the American general public. Studies demonstrate that persons of Japanese descent are readily susceptible to integration in our society if given the opportunity. Strong, The Second-Generation Japanese Problem (1934); Smith, Americans in Process (1937); Mears, Resident Orientals on the American Pacific Coast (1928); Millis, The Japanese Problem in the United States (1942). The failure to accomplish an ideal status of assimilation, therefore, cannot be charged to the refusal of these persons to become Americanized or to their loyalty to Japan. And the retention by some persons of certain customs and religious practices of their ancestors is no criterion of their loyalty to the United States.

[5] Final Report, pp. 10–11. No sinister correlation between the emperor worshipping activities and disloyalty to America was shown.

[6] Final Report, p. 22. The charge of "dual citizenship" springs from a misunderstanding of the simple fact that Japan in the past used the doctrine of *jus sanguinis*, as she had a right to do under international law, and claimed as her citizens all persons born of Japanese nationals wherever located. Japan has greatly modified this doctrine, however, by allowing all Japanese born in the United States to renounce any claim of dual citizenship and by releasing her claim as to all born in the United States after 1925. See Freeman, "Genesis, Exodus, and Leviticus: Genealogy, Evacuation, and Law," 28 Cornell L. Q. 414, 447–8, and authorities there cited; McWilliams, Prejudice, 123–4 (1944).

[7] Final Report, pp. 12–13. We have had various foreign language schools in this country for generations without considering their ex-

certain persons being educated and residing at length in Japan.[8] It is intimated that many of these individuals deliberately resided "adjacent to strategic points," thus enabling them "to carry into execution a tremendous program of sabotage on a mass scale should any considerable number of them have been inclined to do so."[9] The need for protective custody is also asserted. The report refers without identity to "numerous incidents of violence" as well as to other admittedly unverified or cumulative incidents. From this, plus certain other events not shown to have been connected with the Japanese Americans, it is concluded that the "situation was fraught with danger to the Japanese population itself" and that the general public "was ready to take matters into its own hands."[10] Finally, it is intimated, though not directly

istence as ground for racial discrimination. No subversive activities or teachings have been shown in connection with the Japanese schools. McWilliams, Prejudice, 121–3 (1944).

[8] Final Report, pp. 13–15. Such persons constitute a very small part of the entire group and most of them belong to the Kibei movement—the actions and membership of which are well known to our Government agents.

[9] Final Report, p. 10; see also pp. vii, 9, 15–17. This insinuation, based purely upon speculation and circumstantial evidence, completely overlooks the fact that the main geographic pattern of Japanese population was fixed many years ago with reference to economic, social and soil conditions. Limited occupational outlets and social pressures encouraged their concentration near their initial points of entry on the Pacific Coast. That these points may now be near certain strategic military and industrial areas is no proof of a diabolical purpose on the part of Japanese Americans. See McWilliams, Prejudice, 119–121 (1944); House Report No. 2124 (77th Cong., 2d Sess.), 59–93.

[10] Final Report, pp. 8–9. This dangerous doctrine of protective custody, as proved by recent European history, should have absolutely no standing as an excuse for the deprivation of the rights of minority groups. See House Report No. 1911 (77th Cong., 2d Sess.) 1–2. Cf. House Report No. 2124 (77th Cong., 2d Sess.) 145–7. In this

charged or proved, that persons of Japanese ancestry were responsible for three minor isolated shellings and bombings of the Pacific Coast area,[11] as well as for unidentified radio transmissions and night signalling.

The main reasons relied upon by those responsible for the forced evacuation, therefore, do not prove a reasonable relation between the group characteristics of Japanese Americans and the dangers of invasion, sabotage and espionage. The reasons appear, instead, to be largely an accumulation of much of the misinformation, half-truths and insinuations that for years have been directed against Japanese Americans by people with racial and economic prejudices—the same people who have been among the foremost advocates of the evacuation.[12] A military judg-

---

instance, moreover, there are only two minor instances of violence on record involving persons of Japanese ancestry. McWilliams, What About Our Japanese-Americans? Public Affairs Pamphlets, No. 91, p. 8 (1944).

[11] Final Report, p. 18. One of these incidents (the reputed dropping of incendiary bombs on an Oregon forest) occurred on Sept. 9, 1942—a considerable time after the Japanese Americans had been evacuated from their homes and placed in Assembly Centers. See New York Times, Sept. 15, 1942, p. 1, col. 3.

[12] Special interest groups were extremely active in applying pressure for mass evacuation. See House Report No. 2124 (77th Cong., 2d Sess.) 154–6; McWilliams, Prejudice, 126–8 (1944). Mr. Austin E. Anson, managing secretary of the Salinas Vegetable Grower-Shipper Association, has frankly admitted that "We're charged with wanting to get rid of the Japs for selfish reasons. . . . We do. It's a question of whether the white man lives on the Pacific Coast or the brown men. They came into this valley to work, and they stayed to take over. . . . They undersell the white man in the markets. . . . They work their women and children while the white farmer has to pay wages for his help. If all the Japs were removed tomorrow, we'd never miss them in two weeks, because the white farmers can take over and produce everything the Jap grows. And we don't want them back when the war ends, either." Quoted by Taylor in his article "The People Nobody Wants," 214 Sat. Eve. Post 24, 66 (May 9, 1942).

ment based upon such racial and sociological considerations is not entitled to the great weight ordinarily given the judgments based upon strictly military considerations. Especially is this so when every charge relative to race, religion, culture, geographical location, and legal and economic status has been substantially discredited by independent studies made by experts in these matters.[18]

The military necessity which is essential to the validity of the evacuation order thus resolves itself into a few intimations that certain individuals actively aided the enemy, from which it is inferred that the entire group of Japanese Americans could not be trusted to be or remain loyal to the United States. No one denies, of course, that there were some disloyal persons of Japanese descent on the Pacific Coast who did all in their power to aid their ancestral land. Similar disloyal activities have been engaged in by many persons of German, Italian and even more pioneer stock in our country. But to infer that examples of individual disloyalty prove group disloyalty and justify discriminatory action against the entire group is to deny that under our system of law individual guilt is the sole basis for deprivation of rights. Moreover, this inference, which is at the very heart of the evacuation orders, has been used in support of the abhorrent and despicable treatment of minority groups by the dictatorial tyrannies which this nation is now pledged to destroy. To give constitutional sanction to that inference in this case, however well-intentioned may have been the military command on the Pacific Coast, is to adopt one of the cruelest of the rationales used by our enemies to destroy the dignity of the individual and to encourage and open the door to discriminatory actions against other minority groups in the passions of tomorrow.

---

[18] See notes 4–12, *supra.*

No adequate reason is given for the failure to treat these Japanese Americans on an individual basis by holding investigations and hearings to separate the loyal from the disloyal, as was done in the case of persons of German and Italian ancestry. See House Report No. 2124 (77th Cong., 2d Sess.) 247–52. It is asserted merely that the loyalties of this group "were unknown and time was of the essence." [14] Yet nearly four months elapsed after Pearl Harbor before the first exclusion order was issued; nearly eight months went by until the last order was issued; and the last of these "subversive" persons was not actually removed until almost eleven months had elapsed. Leisure and deliberation seem to have been more of the essence than speed. And the fact that conditions were not such as to warrant a declaration of martial law adds strength to the belief that the factors of time and military necessity were not as urgent as they have been represented to be.

Moreover, there was no adequate proof that the Federal Bureau of Investigation and the military and naval intelligence services did not have the espionage and sabotage situation well in hand during this long period. Nor is there any denial of the fact that not one person of Japanese ancestry was accused or convicted of espionage or sabotage after Pearl Harbor while they were still free,[15] a fact which is some evidence of the loyalty of the vast majority of these individuals and of the effectiveness of the established methods of combatting these evils. It

---

[14] Final Report, p. vii; see also p. 18.

[15] The Final Report, p. 34, makes the amazing statement that as of February 14, 1942, "The very fact that no sabotage has taken place to date is a disturbing and confirming indication that such action will be taken." Apparently, in the minds of the military leaders, there was no way that the Japanese Americans could escape the suspicion of sabotage.

seems incredible that under these circumstances it would have been impossible to hold loyalty hearings for the mere 112,000 persons involved—or at least for the 70,000 American citizens—especially when a large part of this number represented children and elderly men and women.[16] Any inconvenience that may have accompanied an attempt to conform to procedural due process cannot be said to justify violations of constitutional rights of individuals.

I dissent, therefore, from this legalization of racism. Racial discrimination in any form and in any degree has no justifiable part whatever in our democratic way of life. It is unattractive in any setting but it is utterly revolting among a free people who have embraced the principles set forth in the Constitution of the United States. All residents of this nation are kin in some way by blood or culture to a foreign land. Yet they are primarily and necessarily a part of the new and distinct civilization of the United States. They must accordingly be treated at all times as the heirs of the American experiment and as entitled to all the rights and freedoms guaranteed by the Constitution.

MR. JUSTICE JACKSON, dissenting.

Korematsu was born on our soil, of parents born in Japan. The Constitution makes him a citizen of the United States by nativity and a citizen of California by

---

[16] During a period of six months, the 112 alien tribunals or hearing boards set up by the British Government shortly after the outbreak of the present war summoned and examined approximately 74,000 German and Austrian aliens. These tribunals determined whether each individual enemy alien was a real enemy of the Allies or only a "friendly enemy." About 64,000 were freed from internment and from any special restrictions, and only 2,000 were interned. Kempner, "The Enemy Alien Problem in the Present War," 34 Amer. Journ. of Int. Law 443, 444–46; House Report No. 2124 (77th Cong., 2d Sess.), 280–1.

residence. No claim is made that he is not loyal to this country. There is no suggestion that apart from the matter involved here he is not law-abiding and well disposed. Korematsu, however, has been convicted of an act not commonly a crime. It consists merely of being present in the state whereof he is a citizen, near the place where he was born, and where all his life he has lived.

Even more unusual is the series of military orders which made this conduct a crime. They forbid such a one to remain, and they also forbid him to leave. They were so drawn that the only way Korematsu could avoid violation was to give himself up to the military authority. This meant submission to custody, examination, and transportation out of the territory, to be followed by indeterminate confinement in detention camps.

A citizen's presence in the locality, however, was made a crime only if his parents were of Japanese birth. Had Korematsu been one of four—the others being, say, a German alien enemy, an Italian alien enemy, and a citizen of American-born ancestors, convicted of treason but out on parole—only Korematsu's presence would have violated the order. The difference between their innocence and his crime would result, not from anything he did, said, or thought, different than they, but only in that he was born of different racial stock.

Now, if any fundamental assumption underlies our system, it is that guilt is personal and not inheritable. Even if all of one's antecedents had been convicted of treason, the Constitution forbids its penalties to be visited upon him, for it provides that "no attainder of treason shall work corruption of blood, or forfeiture except during the life of the person attainted." But here is an attempt to make an otherwise innocent act a crime merely because this prisoner is the son of parents as to whom he had no choice, and belongs to a race from which there is no way to resign. If Congress in peace-time legislation should

enact such a criminal law, I should suppose this Court would refuse to enforce it.

But the "law" which this prisoner is convicted of disregarding is not found in an act of Congress, but in a military order. Neither the Act of Congress nor the Executive Order of the President, nor both together, would afford a basis for this conviction. It rests on the orders of General DeWitt. And it is said that if the military commander had reasonable military grounds for promulgating the orders, they are constitutional and become law, and the Court is required to enforce them. There are several reasons why I cannot subscribe to this doctrine.

It would be impracticable and dangerous idealism to expect or insist that each specific military command in an area of probable operations will conform to conventional tests of constitutionality. When an area is so beset that it must be put under military control at all, the paramount consideration is that its measures be successful, rather than legal. The armed services must protect a society, not merely its Constitution. The very essence of the military job is to marshal physical force, to remove every obstacle to its effectiveness, to give it every strategic advantage. Defense measures will not, and often should not, be held within the limits that bind civil authority in peace. No court can require such a commander in such circumstances to act as a reasonable man; he may be unreasonably cautious and exacting. Perhaps he should be. But a commander in temporarily focusing the life of a community on defense is carrying out a military program; he is not making law in the sense the courts know the term. He issues orders, and they may have a certain authority as military commands, although they may be very bad as constitutional law.

But if we cannot confine military expedients by the Constitution, neither would I distort the Constitution to approve all that the military may deem expedient. That is

what the Court appears to be doing, whether consciously or not. I cannot say, from any evidence before me, that the orders of General DeWitt were not reasonably expedient military precautions, nor could I say that they were. But even if they were permissible military procedures, I deny that it follows that they are constitutional. If, as the Court holds, it does follow, then we may as well say that any military order will be constitutional and have done with it.

The limitation under which courts always will labor in examining the necessity for a military order are illustrated by this case. How does the Court know that these orders have a reasonable basis in necessity? No evidence whatever on that subject has been taken by this or any other court. There is sharp controversy as to the credibility of the DeWitt report. So the Court, having no real evidence before it, has no choice but to accept General DeWitt's own unsworn, self-serving statement, untested by any cross-examination, that what he did was reasonable. And thus it will always be when courts try to look into the reasonableness of a military order.

In the very nature of things, military decisions are not susceptible of intelligent judicial appraisal. They do not pretend to rest on evidence, but are made on information that often would not be admissible and on assumptions that could not be proved. Information in support of an order could not be disclosed to courts without danger that it would reach the enemy. Neither can courts act on communications made in confidence. Hence courts can never have any real alternative to accepting the mere declaration of the authority that issued the order that it was reasonably necessary from a military viewpoint.

Much is said of the danger to liberty from the Army program for deporting and detaining these citizens of Japanese extraction. But a judicial construction of the due process clause that will sustain this order is a far more

subtle blow to liberty than the promulgation of the order itself. A military order, however unconstitutional, is not apt to last longer than the military emergency. Even during that period a succeeding commander may revoke it all. But once a judicial opinion rationalizes such an order to show that it conforms to the Constitution, or rather rationalizes the Constitution to show that the Constitution sanctions such an order, the Court for all time has validated the principle of racial discrimination in criminal procedure and of transplanting American citizens. The principle then lies about like a loaded weapon ready for the hand of any authority that can bring forward a plausible claim of an urgent need. Every repetition imbeds that principle more deeply in our law and thinking and expands it to new purposes. All who observe the work of courts are familiar with what Judge Cardozo described as "the tendency of a principle to expand itself to the limit of its logic." [1] A military commander may overstep the bounds of constitutionality, and it is an incident. But if we review and approve, that passing incident becomes the doctrine of the Constitution. There it has a generative power of its own, and all that it creates will be in its own image. Nothing better illustrates this danger than does the Court's opinion in this case.

It argues that we are bound to uphold the conviction of Korematsu because we upheld one in *Hirabayashi* v. *United States*, 320 U. S. 81, when we sustained these orders in so far as they applied a curfew requirement to a citizen of Japanese ancestry. I think we should learn something from that experience.

In that case we were urged to consider only the curfew feature, that being all that technically was involved, because it was the only count necessary to sustain Hirabayashi's conviction and sentence. We yielded, and the Chief Justice guarded the opinion as carefully as language

---

[1] Nature of the Judicial Process, p. 51.

will do. He said: "Our investigation here does not go beyond the inquiry whether, in the light of all the relevant circumstances preceding and attending their promulgation, the challenged orders and statute *afforded a reasonable basis for the action taken in imposing the curfew.*" 320 U. S. at 101. "We decide only the issue as we have defined it—we decide only that the *curfew order* as applied, and at the time it was applied, was within the boundaries of the war power." 320 U. S. at 102. And again: "It is unnecessary to consider whether or to what extent *such findings would support orders differing from the curfew order.*" 320 U. S. at 105. (Italics supplied.) However, in spite of our limiting words we did validate a discrimination on the basis of ancestry for mild and temporary deprivation of liberty. Now the principle of racial discrimination is pushed from support of mild measures to very harsh ones, and from temporary deprivations to indeterminate ones. And the precedent which it is said requires us to do so is *Hirabayashi.* The Court is now saying that in *Hirabayashi* we did decide the very things we there said we were not deciding. Because we said that these citizens could be made to stay in their homes during the hours of dark, it is said we must require them to leave home entirely; and if that, we are told they may also be taken into custody for deportation; and if that, it is argued they may also be held for some undetermined time in detention camps. How far the principle of this case would be extended before plausible reasons would play out, I do not know.

I should hold that a civil court cannot be made to enforce an order which violates constitutional limitations even if it is a reasonable exercise of military authority. The courts can exercise only the judicial power, can apply only law, and must abide by the Constitution, or they cease to be civil courts and become instruments of military policy.

Of course the existence of a military power resting on force, so vagrant, so centralized, so necessarily heedless of the individual, is an inherent threat to liberty. But I would not lead people to rely on this Court for a review that seems to me wholly delusive. The military reasonableness of these orders can only be determined by military superiors. If the people ever let command of the war power fall into irresponsible and unscrupulous hands, the courts wield no power equal to its restraint. The chief restraint upon those who command the physical forces of the country, in the future as in the past, must be their responsibility to the political judgments of their contemporaries and to the moral judgments of history.

My duties as a justice as I see them do not require me to make a military judgment as to whether General De-Witt's evacuation and detention program was a reasonable military necessity. I do not suggest that the courts should have attempted to interfere with the Army in carrying out its task. But I do not think they may be asked to execute a military expedient that has no place in law under the Constitution. I would reverse the judgment and discharge the prisoner.