**MONTANA CONTRACTORS' ASSOCIATION et al., Plaintiffs,**

**and**

**Donna Higgins, d/b/a Higgins & Co., Intervenor,**

v.

**The SECRETARY OF COMMERCE et al., Defendants.**

**LLOYD C. LOCKREM, INC., et al., Plaintiffs,**

v.

**The SECRETARY OF COMMERCE et al., Defendants.**

**Nos. CV 77–62–M, CV 77–153 BLG.**

United States District Court, D. Montana, Missoula and Billings Divisions.

Nov. 24, 1978.

Urban L. Roth, Poore, McKenzie, Roth, Robischon & Robinson, P.C., James Harrington, Butte, Mont., for plaintiffs.

Robert T. O'Leary, Butte, Mont., Glen Neier, White Sulphur Springs, Mont., Gerald Hartman, Dept. of Justice, Employment Sec., Civil Rights Division, Washington, D.C., for defendants.

Murray, Donahue & Kaufman, Kalispell, Mont., for City of Kalispell.

## OPINION

RUSSELL E. SMITH, Chief Judge.

This case was brought to test the constitutionality of the Minority Business Enterprise (MBE) requirement of the Public Works Employment Act of 1977, Section 103(f)(2) of Pub.L. No. 95–28, 91 Stat. 116, 42 U.S.C. § 6705(f)(2), which provides:

> Except to the extent that the Secretary determines otherwise, no grant shall be made under this chapter for any local public works project unless the applicant gives satisfactory assurance to the Secretary that at least 10 per centum of the amount of each grant shall be expended for minority business enterprises. For purposes of this paragraph, the term "minority business enterprise" means a business at least 50 per centum of which is owned by minority group members or, in case of a publicly owned business, at least 51 per centum of the stock of which is owned by minority group members. For the purposes of the preceding sentence, minority group members are citizens of the United States who are Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts.

The Act itself uses the words "Negroes, Spanish-speaking, Orientals, Indians, Eskimos, and Aleuts" without definition. In this case the problem of definition is different and more important than in other cases

dealing with affirmative action.[1] In those cases the discriminating actor defines the race as to which relief should be granted by his act of discrimination, and when the remedy is fashioned, it necessarily is tailored to correct the actual injustice done. Thus, in the case of *Carter v. Gallagher*, 452 F.2d 315, *modified on rehearing en banc*, 452 F.2d 327 (8th Cir. 1972), had it been necessary to define an Indian or a Black to determine who should be counted as a member of the quota established (which it apparently was not) the court could have looked at the actual discrimination being rectified and treated as Blacks or Indians the same kind of people that the defendants had treated as Blacks or Indians.

Under the guidelines adopted by the Economic Development Administration,[2] almost any degree of minority blood is sufficient, but as to Indians an extra requirement was added, as follows: "Indian—an individual having origins in any of the original people of North America and who is recognized as an Indian by either a tribe, tribal organiza-

tion or a suitable authority in the community. (A suitable authority in the community may be: educational institutions, religious organizations, or state agencies.)" It is noted that the recognition comes not from Congress,[3] not from an authorized administrative agency, but from a tribe, church, educational institution, or state agency.

Because almost anybody with any degree of minority blood may be in the class favored by the MBE requirement, I conclude that the law does not conform to the standards set by *Regents of the University of California v. Bakke*, —— U.S. ——, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).

Nonminority contractors do not have a right to participate equally in the bidding for public contracts, and when they do participate with minority enterprises or subcontractors, they are required to give a preferential treatment to them, which they would not be required to give to nonminority subcontractors.[4] The law does discriminate against them.

---

1. *See, e. g., Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Associated General Contractors of Massachusetts, Inc. v. Altshuler*, 490 F.2d 9 (1st Cir. 1973), *cert. denied*, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974); *Bridgeport Guardians, Inc. v. Civil Service Commission*, 482 F.2d 1333 (2d Cir. 1973); *Carter v. Gallagher*, 452 F.2d 315, *modified on rehearing en banc*, 452 F.2d 327 (8th Cir. 1972). These cases were cited by Justice Powell in *Regents of the University of California v. Bakke*, —— U.S. ——, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978).

2. EDA Minority Business Enterprise Technical Bulletin of October 11, 1977.

3. Congress has on occasion taken care to define the word "Indian." *See* 25 U.S.C. § 1603(c).

4. For example, the guidelines provide:
   An MBE is qualified if it can perform the services or supply the materials that are needed. Grantees and prime contractors will be expected to use MBE's with less experience than available nonminority enterprises and should expect to provide technical assistance to MBE's as needed. Inability to obtain bonding will ordinarily not disqualify an MBE. Grantees and prime contractors are expected to help MBE's obtain bonding, to include MBE's in any overall bond or to waive bonding where feasible. The Small

Business Administration (SBA) is prepared to provide a 90% guarantee for the bond of any MBE participating in an LPW project. Lack of working capital will not ordinarily disqualify an MBE. SBA is prepared to provide working capital assistance to any MBE participating in an LPW project. Grantees and prime contractors are expected to assist MBE's in obtaining working capital through SBA or otherwise.
and
   Only the Grantee can request a waiver. Ordinarily a waiver request will be considered only after the Grantee and its prime contractors have taken every feasible action to achieve at least 10% MBE participation. For example, if the Grantee or its prime contractors have taken all feasible steps to locate relevant MBE's and have requested all available qualified MBE's to participate as contractors, subcontractors or suppliers and not enough MBE's can or will participate to reach the 10% MBE participation goal, a waiver request detailing the efforts of the Grantee and its prime contractor may be necessary in order for the project to proceed. Such a waiver request would ordinarily be made after the initial bidding or negotiation procedures proved unsuccessful
Guidelines for 10% Minority Business Participation in LPW Grants, pp. 3–4, 14–15.

■ I think that Justice Powell's opinion in *Bakke* stands for this: The equal protection concept embraced in the fifth amendment forbids racial discrimination. Where a law on its face is racially discriminatory, it must be subjected to the most rigid scrutiny. Thus, Justice Powell quoted from *Hirabayashi v. United States*, 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943), as follows: "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality," and from *Korematsu v. United States*, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944) as follows: ". . . [A]ll legal restrictions which curtail the civil rights of a single racial group are immediately suspect. That is not to say that all such restrictions are unconstitutional. It is to say that courts must subject them to the most rigid scrutiny." [5]

■ Preferences may be justified to serve a compelling public need, but when that need is determined, the remedy must be precisely tailored to fit it. Where a group is selected for special treatment, the public interest justifying that selection should be based on some factors common to the members of that group. If previous discrimination is one of the factors justifying a selection, then, generally speaking, the inclusion of members in the group who have not been the victims of discrimination would not serve the public interest. By the same token, if to remedy the damage done or to promote racial equality a law is enacted which includes individuals upon whom those factors have not operated, then the remedy has not been precisely tailored.

■ I am able to find a public need to remedy the effects of past discrimination, and I judicially note that minority races have been the victims of discrimination. Were a law enacted for the purpose of carrying out some "guardian-ward" policy of the federal government, I could find a need if the law were restricted to "wards." *Bakke*, however, in my opinion, forbids the use of a general societal discrimination to justify a scheme which seeks to insure that in any given facet of public life the percentages of races are proportionate. If such is not permitted, then I conclude that the remedy here is not precisely tailored to serve the compelling public interest.

■ Because racial and ethnic distinctions of any sort are inherently suspect and call for the most exacting judicial examination, I think it necessary that the justification for this law appear by legislative, administrative, or judicial findings. *See Bakke* at —— U.S. ——, 98 S.Ct. 2733, 57 L.Ed.2d 750. If it be assumed that the debates on the floor of the House and reports of government agencies not made in connection with the MBE requirement (which was added by amendment on the floor of the House) are findings,[6] they do no

---

5. It is urged that the doctrine of strict scrutiny should not apply to American Indians because of their unique relationship with the United States. Although Justice Powell said, "It is far too late to argue that the guarantee of equal protection to *all* persons permits the recognition of special wards entitled to a degree of protection greater than that accorded others," there was no special Indian policy involved in *Bakke* because Indians had not been admitted to the medical school at Davis and because the Court was examining the relationship between minorities and a medical school, not the relationship between minorities and the United States Congress. I think that the "guardian-ward" relationship has existed between the United States and Indians and that that relationship could justify differences in treatment. There is, however, no indication here that the Congress was acting in furtherance of a gov-

ernmental policy directed to Indians as "wards" or that the definition of the term "Indian" would be what it is here if Congress had been acting in furtherance of the role of a "guardian." In the scrutiny of a law dealing with Indians, the unique history of the Indian must be recognized as a factor, but in my opinion the scrutiny must be strict.

6. The decisions in the cases of *Fullilove v. Kreps*, 584 F.2d 600 (1978), and *Associated General Contractors v. Kreps*, No. F78-1 (D.Alas. Oct. 5, 1978), treat the remarks of the proponents of the MBE amendment on the floor of the House and a report of the House Subcommittee on Small Business Administration as legislative findings. I note these decisions only to express my disagreement with them. I have no doubt that debates may be taken as evidence of the intent of Congress for,

more than find that the minority races do not participate in equal proportion in government bidding, and state the conclusion that this is because of discrimination. They make no distinction between races, and there are no findings justifying an all-inclusive preference for all members of a race regardless of the degree of dilution of blood or any past history.[7]

I judicially note that there has been some integration of all races in this country and that there are vast differences between the cultural and economic levels of the individuals of each race. I am not able to notice that the needs of the Japanese in Hawaii are the same as those of the Japanese in California or that the needs of the Indians in New York are the same as those of the Indians in Montana. I speak largely of the Indians in Montana because of what I may judicially note to be true in Montana and because of what the record in this case tells me.[8] The court judicially notes that many tribal members with small fractions of Indian blood have moved from the reservations and into the mainstream of Montana life. These people are indistinguishable in name, skin color, dress, and use of language from their non-Indian neighbors. It is likely that such integration in Montana is less than in those Eastern states where Indians and non-Indians have been living close to each other for a much longer time and in those states where there have been no reserva-

tions to foster racial separateness. The court judicially notes that in some Montana tribes one-eighth Indian blood qualifies a person for tribal membership.

The record here proves what is judicially noted. Thus, among the people qualified to bid on EDA projects who were called as witnesses were Walter Fouty, who is one-eighth Confederated Salish and Kootenai; William L. Kelly, who is one-fourth Crow; Ronald Paul, who is 15/32 Blackfeet; and Raymond Wetzel, who is one-fourth Cree-Chippewa. The three first named were tribal members while Wetzel was designated as an Indian by the Montana State Highway Commission. Of the four, one has had post high school vocational and college training and is a member of a family which has been contracting in the logging business for 25 years. Another has been in military service, has worked as an apprentice and as a journeyman electrician; he has worked on the North Slope in Alaska with a salary of some $40,000.00 per year, and in Iran as an assistant superintendent. Another has been an apprentice and a journeyman floor coverer working for non-Indian employers. Another has been in the construction business most of his life and was in his father's business on the West coast for some time. He has a net worth of $800,000.00. Of the four, only one could be readily identified as a person with any Indian heritage; he was the one who had lived on the West coast.

after all, intent is a state of mind, and what is said tends to reveal what is in the mind. However, to take the words of a partisan in one house and to assume that the passage of a bill on which the partisan spoke constituted an adoption of those words by both houses and an implied finding that they were true by two houses is to assume more than I am able to assume.

I am unable to accept the House Subcommittee Report on Small Business Administration Oversight and Minority Business Enterprise as a congressional finding. The Report was not made in conjunction with the MBE amendment, and to conclude that a majority of the members of Congress read it and by passage of the amendment adopted it is more than I am able to conclude.

7. The only finding which relates in any way to a specific race is found in H.R. Rep. No. 95–20, 95th Cong., 1st Sess., reprinted in [1977] U.S.

Code Cong. & Admin. News, pp. 150, 152, which noted the extremely high unemployment rate on Western Indian reservations as an explanation of the 2½ percent of the appropriations which was set aside for grants for Indian reservations.

8. There are no black minority business enterprises in the state. The witnesses who appeared as minority business entrepreneurs were all American Indians. Except for one brief reference to a Spanish-speaking contractor, all of the evidence concerns minority business enterprises controlled by Indians. I judicially note the fact that American Indians comprise 3.8 percent of the population in Montana and are the largest minority group, there being about 26,000 Indians as compared with 3,000 members of other minority groups, including Negroes.

There was no evidence that any of these persons had been victims of discrimination. The MBE provision had helped them enter the contracting business, but the difficulties which they had experienced in becoming successful competitive bidders were those which any nonminority member could experience—that is, lack of capital, lack of bonding capacity, and, perhaps most important, lack of a "track record" demonstrating reliability and capability.

It may be that the number of persons bearing any degree of Indian blood who could be certified by some tribe or agency as Indian, who are in fact fully integrated into a non-Indian society, is minimal and unimportant in the overall view; it may be that the United States cannot raise the economic level of those Indians who need help without preferring all with any degree of Indian blood; it may be that, if persons with some degree of Indian blood are given government contracts, they will in turn give employment to other Indians by contract or otherwise and thus improve the general economic status of the Indian. It may be that these or other reasons would justify the Act under consideration, but there are no administrative or congressional findings, and in the face of the record, I am unable to find that the law here has been precisely tailored to serve a compelling public interest.

The things I judicially note and the facts shown in the record here prevent me from finding what I would be required to find to sustain this Act as to Indians. Likewise, I am unable to make the necessary positive findings as to other races here and in other places. I do find that the law denies equal protection to the plaintiffs and intervenor here, and is for that reason unconstitutional.

By reason of the fact that the grant to Belt, Montana, has been made, but that no contract is let, and the grant has not been fully distributed, the action is not moot.

This opinion constitutes the findings of fact and conclusions of law of the court.