**Emma GRIER, Daniel Vasquez, and Betty Whitson, on behalf of themselves and all others similarly situated, Plaintiffs,**

**v.**

**Albert H. BOWKER, individually and as Chancellor of the City University of New York and the New York City Board of Higher Education, Defendants.**

No. 70 Civ. 2358.

United States District Court,
S. D. New York.

June 22, 1970.

Marttie Thompson, John Dewitt Gregory, New York City, for plaintiffs; Lawrence J. Fox, John C. Gray, Jr., New York City, of counsel.

J. Lee Rankin, Corp. Counsel, New York City, for defendants; Victor P. Muskin, Hewlett, N. Y., of counsel.

COOPER, District Judge.

This is a purported class action brought by plaintiffs on behalf of themselves and all other community college students who desire to attend summer sessions at either a senior college of the City University of New York or a community college of the State University against defendants, the Chancellor of the City University and the New York City Board of Higher Education, pursuant to 42 U.S.C. § 1983. Plaintiffs allege that the charging of a summer session tuition of $10 per credit hour to matriculated community college students while charging no tuition to matriculated senior college students is discriminatory and violates the equal protection clause of the Fourteenth Amendment. By way of relief, plaintiffs seek a declaratory judgment that this summer tuition system is unconstitutional and a permanent injunction against its continued use, as well as certain damages.

Plaintiffs now move pursuant to Rule 65, F.R.Civ.P., for a preliminary injunction barring the defendants from charging tuition to those members of the class who would be unable to attend summer school if these fees were assessed.

The following opinion constitutes our findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P.

Regular registration for the summer sessions ended June 9, 1970. Late registration upon the payment of a penalty fee was permitted up to the commencement of summer session classes on June 15, 1970.

This motion was brought on by an order to show cause served on defendants Friday, June 5, 1970 at 4:30 P.M. On the return day, June 9, 1970, this motion was referred to us. On June 11, 1970, the parties appearing before us in open court we thereupon granted defendants' application for an adjournment to serve and file answering papers; we set June 17, 1970 for submission of all papers.

This abbreviated time schedule was compelled by the fact that plaintiffs did not commence suit and bring on this motion until the very eve of the summer session. Upon our request defendants readily agreed on June 11, 1970 to admit to the summer session the thirty-one class members named herein and defer until the resolution of this motion the payment of tuition fees by these students, with the distinct understanding however that should a preliminary injunction be denied they would either pay the required fee or discontinue their enrollment in the summer session.

\* \* \*

A preliminary injunction is an extraordinary remedy, issuable reluctantly, whose purpose is to preserve the status quo and prevent irreparable injury until the case can be ultimately resolved. See Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 204 (2d Cir. 1966); Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir. 1969). "A clear showing of probable success *and* possible irreparable injury" is necessary. Checker Motors Corp. v. Chrysler Corp., *supra*; Clairol Inc. v. Gillette Co., 389 F.2d 264, 265 (2d Cir. 1968).

### Probability Of Success

#### a. *Fundamental Liberty*

Traditionally, judicial examination of governmentally created classifications has been restricted to a determination whether the unequal treatment is bottomed upon a reasonable distinction having some rational relationship to a

legitimate public policy. See e. g. Morey v. Doud, 354 U.S. 457, 463–464, 77 S. Ct. 1344, 1 L.Ed.2d 1485 (1957); Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369 (1911). However, certain interests of the individual have been deemed so fundamental, that any state imposed discrimination on the exercise of these rights is justified only by a compelling state interest. See e. g. Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). Included in this category are voting rights, e. g. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), all racial classifications, e. g. Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L. Ed. 194 (1944), and certain rights with respect to criminal procedure, e. g. Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (right to appellate review).

Plaintiffs assert that equality of educational opportunity falls within this more closely scrutinized area of fundamental rights, and therefore it is incumbent upon the state to establish a compelling interest warranting the continuation of the $10 per credit course charge to the community college student. Firmly entrenched judicially is that "education is perhaps the most important function of state and local governments," Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98

L.Ed. 873 (1954), and that as " * * * society grows increasingly complex, and our need for trained leaders increases * * * the epitome of that need * * * [is] to obtain an advanced degree in education, to become, by definition, a leader and trainer of others," McLaurin v. Oklahoma State Regents, 339 U.S. 637, 641, 70 S.Ct. 851, 853, 94 L.Ed. 1145 (1950). We cannot conclude however that the interest plaintiffs seek to assert in this litigation has been defined as fundamental. Plaintiffs' principal reliance on Brown, supra, and McLaurin, supra is misplaced. The educational classifications there found to deny equal protection inextricably involved racial considerations as well. This latter element—discrimination based upon race, lineage and alienage—has long placed such statutory regulation into that "suspect" category, and subject "to the most rigid scrutiny." Korematsu, supra, 323 U.S. at 216, 65 S.Ct. 193; Plessy v. Ferguson, 163 U.S. 537, 559, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (Harlan, J., dissenting).

Further, the issue now before this Court is not a scheme excluding any one group from regular educational opportunity, but attendance at a summer session without a minimal per credit charge. Involved in this litigation is not the opportunity to pursue elementary education but the taking of courses at college level during the summer to enable a student to complete a college career at a faster pace. This limited interest, as we see it, has not been fastened within the ambit of the concept of fundamental right.[1]

Plaintiffs also press the argument that defendants must establish a compel-

---

1. "Education, by contrast, presents a more difficult task for justification of active review. Certainly, judicial competence to deal with the complex problems that plague educational institutions is open to serious question. Moreover, the difficulties of giving effect to decisions in this area are enormous. Unlike voting and fair criminal procedure, education is not an interest which has long been recognized to be of pre-eminent im-

portance. Nevertheless, the pivotal position of education to success in American society and its essential role in opening up to the individual the central experience of our culture lend it an importance that is undeniable. Even so, education does not seem quite so fundamental as rights of criminal defense and voting." Developments in the Law Equal Protection, 82 Harv.L.Rev. 1065, 1129 (1969).

ling explanation for the disparity in treatment because this financial arrangement, as presently constituted, adversely affects the indigent in violation of the Equal Protection Clause.[2]

■ At the outset we note that plaintiffs do not assert that there is an abstract right to attend college without payment of tuition. (Plaintiffs' Memorandum In Support Of Application For Preliminary Injunction, June 5, 1970, p. 9.) Such an argument, were it advanced, would be unavailing under the present state of the law.

Plaintiffs seek to establish that, similar to race, a classification which adversely affects a particular economic status falls within the category of distinctions that are inherently suspect. In support of this proposition, they rely principally upon Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), and Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). However, unlike racial discrimination cases, courts finding a denial of equal protection relating to economic classification have reached such resolution where the state regulation excluded the individual, by reason of his depressed economic status, from exercising a basic right freely available to the more affluent members of society.

In Griffin, supra, petitioners, by reason of their poverty, were denied appellate review from criminal convictions. "Statistics show that a substantial proportion of criminal convictions are reversed by state appellate courts. Thus to deny adequate review to the poor means that many of them may lose their life, liberty or property be-

cause of unjust convictions which appellate courts would set aside." at 18–919, 76 S.Ct. at 590.

In Douglas, supra, the court found California's provision that appointment of counsel on appeal was in the discretion of the appellate court denied petitioner "any real chance he may have had of showing that his appeal has hidden merit." 372 U.S. at 356, 83 S.Ct. at 816.[3] Both cases involved providing equal access to the judicial process to insure equal justice to all and special privileges to none in the administration of our criminal law.

Further, other cases rejecting state schemes related to economic status have likewise concerned fundamental rights. In Shapiro, supra, economic classification wrongfully interfered with appellant's "fundamental right of interstate movement," the court finding that the state statute penalized the exercise of a constitutional right. Similarly, in Harper, supra, imposition of a poll tax violated the Equal Protection Clause in making the affluence of the voter an electoral standard impinging upon the "right to vote [which] is too precious, too fundamental to be so burdened." at 670.

The right asserted by plaintiffs, junior college students, of an opportunity to attend summer school at the college level without payment of any costs cannot fairly be analogized to the rights involved in the cases touched upon above. The classification does not directly deny educational opportunities to the indigent community college student who is provided regular courses during the winter terms without payment of a per credit fee. Further, substantial members of

---

2. Plaintiffs assert that the $10 fee charged to community college students denies the most indigent of them in that class an opportunity to attend summer session.

3. The court went on to find "it is appropriate to observe that a state can, consistently with the Fourteenth Amendment, provide for differences so long as the result does not amount to a denial of due process or an 'invidious discrim-

ination'. [citations omitted] Absolute equality is not required; lines can be and are drawn and we often sustain them. [citations omitted] But where the merits of *the one and only appeal* an indigent has as of right are decided without benefit of counsel, we think an unconstitutional line has been drawn between rich and poor" at 356–357, 83 S.Ct. at 816.

the group who could not afford such a $10 fee have the opportunity to attend summer school by virtue of their enrollment at a senior branch of the city university. Under the open enrollment plan to be adopted this forthcoming semester there is insufficient data to support a finding that the senior college register will include only students of a higher economic level than the community college. Granting plaintiffs' requested relief under the theory proposed would aparently require our finding that the imposition of any tuition for attendance at a public university would violate the Equal Protection Clause,[4] a position certainly at this stage of the proceedings we cannot foresee as a probable result of this litigation.

### b. Reasonable Relationship to Legitimate Public Policy

We find that the recent Supreme Court decision of Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1969) sheds much light on the issues before us. There, the court was faced with a statutory scheme which concededly involved "the most basic economic needs of impoverished human beings,"[5] a far more compelling factual background. Yet that court applied the standard traditionally employed in resolving whether a statute in the area of economics and social welfare, and providing for classifications which are imperfect, violates the Equal Protection Clause.

> "If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety, or because in practice it results in some inequality.' * * * 'The problems of government are practical ones and may justify, if they do not require, rough accommodations

—illogical, it may be, and unscientific.' * * * 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' "
*Dandridge*, at 485, 90 S.Ct. at 1161 (citations omitted).

We find this standard applicable in the controversy before us. As in *Dandridge*, the court while realizing that this definition was in the main employed in cases involving state regulation of business or industry, and that administration of public welfare concerned far more basic needs, found "no basis for applying a different constitutional standard." at 485, 90 S.Ct. at 1162.

Based upon the papers before us, we believe plaintiffs have failed to show a probability of success on the merits. There appears to be a rational basis for the distinctions made between community and senior college students. The classification is neither arbitrary nor invidious.

The community colleges of the State University and the senior colleges of the City University are financed under separate statutory schemes, which statutes are not here challenged. The differing financial structures of the two systems provide a rational basis for the different treatment accorded summer session students in the matter of tuition.

The four year senior colleges, which are part of the City University, are governed by Article 125 of the New York Education Law, McKinney's Consol. Laws, c. 16, and financed in accordance with sections 6215 and 6216 thereunder. These sections provide in essence that, after deducting any fees collected, the State and City share equally the remaining cost of running these colleges. State and City monetary appropriations have been sufficient to avoid imposition of fees for matriculated students there.

---

4. If consideration of economic status alone is a sufficient basis for striking down a classification, the charging of any fee at the university would discriminate against that group and adversely affect their educational opportunity.

5. *Dandridge* involved Maryland's maximum grant regulation which limited the amount of money one family could receive under its Aid to Families with Dependent Children program.

The two year community colleges, which are part of the State University, and are locally sponsored by defendant New York City Board of Higher Education, are governed by Article 126 of the Education Law and financed in accordance with section 6304 thereof. The effect of that provision is that the State provides a set amount, approximately forty percent of the budget cost of each community college, and the balance, less tuition and fees, is supplied by the City. At present insufficient funds have been appropriated by the City to permit elimination of summer session tuition, although this has been achieved for the regular school year.

Limits on the public purse must be recognized. We cannot require the City to allocate more of its budget than it already does to education. The Constitution requires only that in using the funds made available the lines drawn be rationally based and not invidiously discriminatory. Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 25 L. Ed.2d 491 (1970).

The City must work within the established statutory financing provisions, which are not attacked by this suit. We believe the City may rationally conclude, as it evidently has, that with limited funds allotted it gets the most out of the dollars it has available for higher education by charging tuition only to community college students. This follows because of the difference in statutory funding procedures which operates to require the City to pay only one half of the cost of avoiding tuition fees at the City University but to pay the full cost of eliminating tuition fees at the community colleges. We cannot conclude that it is irrational or arbitrary for the City to attempt to double the effectiveness of each of its educational dollars by obtaining matching state funds to the full extent allowable through the statutory procedure for the financing of the senior colleges.

Of all the possible allocations of the City's limited funds, this method permits the greatest number of students to attend college tuition-free. It is true that the consequence of this allocation is to leave community college students with a tuition charge for the summer session. Nevertheless, as the Supreme Court reaffirmed in Dandridge, "the Equal Protection Clause does not require that a state must choose between attacking every aspect of a problem or not attacking the problem at all." 397 U.S. at 486–487, 90 S.Ct. at 1162.

The alternative proposed by plaintiffs of having the community college and senior college student bear any budget deficit equally may itself have serious adverse effects. Thus, for every dollar of community college tuition lost, two dollars of senior college tuition must replace it. By equalizing the cost among all students in the manner suggested not only will the number of students needing additional financial aid to attend summer sessions be greatly increased, but the total of such aid requested of the City by all students is likely to be significantly increased. As a consequence, the result of the procedure plaintiffs suggest might well be to increase the number of poor students unable to attend summer sessions.

The conclusion of the Supreme Court in Dandridge, where it was faced with Maryland's maximum family grant regulation, appears to us to be pertinent to the public financing of higher education which concerns us here:

"Conflicting claims of morality and intelligence are raised by opponents and proponents of almost every measure, certainly including the one before us. But the intractable economic, social, and even philosophical problems presented by public welfare assistance programs are not the business of this Court. * * * [T]he Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." 397 U.S. at 487, 90 S.Ct. at 1162.

Accordingly, we believe it unlikely that plaintiffs will succeed upon the final resolution of the merits of their claims.

### Status Quo

The status quo has been frequently defined as the last uncontested status which preceded the pending controversy. See Warner Bros. Pictures v. Gittone, 110 F.2d 292, 293 (3d Cir.1940). A preliminary injunction should serve "to keep the parties, while the suit goes on, as far as possible in the respective positions they occupied when the suit began." Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742 (2d Cir. 1953).

■ Granting plaintiffs the relief they seek at this preliminary stage would not preserve the status quo; rather, it might seriously disrupt the operation of the summer sessions and the plans of those attending them. Despite our repeated requests, neither party has been able to estimate the number of community college students who wish to attend summer sessions but are prevented from doing so because they cannot afford the tuition—the relevant subclass for purposes of this motion for a preliminary injunction.[6] Plaintiffs in open court suggested this group might number hundreds, perhaps thousands of students.

We are dealing with vast uncertainties. The number may be enormous in light of the apparent problems of devising a fair, workable and practical method to identify this limited sub-class. Senior college students already enrolled on a tuition-free basis have legitimately relied upon that fact and could not fairly be assessed tuition at this point for the classes in which they are already enrolled. We are informed by the New York City Board of Higher Education that a significant loss of anticipated community college tuitions would result in a sharp curtailment of the summer session program. See Affidavit of T. E. Hollander, Vice-Chancellor for Budget and Planning of the Board of Higher Education of the City of New York, June 17, 1970, para. 8.

Only upon a strong showing of probable eventual success, a showing not present here, should a preliminary injunction having such potential for disturbing the status quo be granted.

### Irreparable Injury

Defendants inform us · that a work-study program is available to any indigent student. "Such programs usually involve part-time employment of up to twenty hours per week, and the salaries paid more than fully cover tuition charges." Further, "an indigent student's public assistance benefits are not affected by his participation in a work-study program." Affidavit of T. E. Hollander, Vice Chancellor for Budget and Planning of the Board of Higher Education of the City of New York, June 17, 1970, para. 11.

Plaintiffs respond that while work-study programs are available for the summer session, these programs cannot fully cover the cost of tuition and provide even a subsistence level standard of living. Affidavit of L. J. Fox, Esq., June 18, 1970, para. 2–3.

■ We find it unnecessary to resolve this issue since, as we see it, plaintiffs have failed to show probable success on the merits, a prerequisite to the issuance of the preliminary injunction

---

6. We are informed by plaintiffs that in 1969–70 the total enrollment in the senior colleges of the City University (including graduate schools) was 117,786 for the academic year. The community college enrollment was 24,727. Summer school enrollment in 1969 was 55,793 of whom 40,557 were senior college students and 15,236 were community college students. Affidavit of D. White, June 17, 1970. Defendants state that in 1969 there were 6356 matriculated students enrolled in the summer sessions of the community colleges. Affidavit of T. E. Hollander, Vice Chancellor for Budget and Planning of the Board of Higher Education of the City of New York, June 17, 1970, para. 8.

they seek. We note, however, that whatever irreparable injury plaintiffs may suffer is chargeable not to any recent change in policy by defendants (summer session tuition for community college students has been charged in the past) but to the lateness of the hour at which plaintiffs brought suit.

### Conclusion

For the reasons set forth above, plaintiffs' motion for a preliminary injunction is denied.

This shall be considered an order; settlement thereof is unnecessary.