Willie L. STRAIN, on his own behalf and on behalf of all others similarly situated, et al., Plaintiffs,

United States of America, Plaintiff-Intervenor,

v.

Harry M. PHILPOTT, as President of Auburn University, et al., Defendants.

Civ. A. No. 840–E.

United States District Court, M. D. Alabama, E. D.

Sept. 1, 1971.

Solomon S. Seay, Jr., of Gray, Seay & Langford, Montgomery, Ala., for plaintiffs.

Ira DeMent, U. S. Atty., Montgomery, Ala., and Stephen P. Passek, Atty., U. S. Dept. of Justice, Civil Rights Div., Washington, D. C., for plaintiff-intervenor.

James J. Carter, of Hill, Hill, Stovall, Carter & Franco, Montgomery, Ala., and Thomas D. Samford, III, of Samford & Samford, Opelika, Ala., for defendants Philpott, Robertson and Trustees of Auburn University.

John P. Kohn, Montgomery, Ala., for defendant Montgomery County Bd. of Revenue.

Poole & Poole, Greenville, Ala., for Butler County Court of Commissioners.

Rowe & Lane, Enterprise, Ala., for Coffee County Court of Commissioners.

T. G. Gayle, Selma, Ala., for Dallas County Bd. of Revenue.

Fite, Davis & Fite, Hamilton, Ala., for Marion County Bd. of Revenue.

W. B. Arbuthnot, Marion, Ala., and Leslie Hall, Montgomery, Ala., for Perry County Court of Commissioners.

## OPINION

FRANK M. JOHNSON, Chief Judge.

This class action claims violations of the Fifth and Fourteenth Amendments of the United States Constitution, 42 U. S.C. §§ 1981, 1983, and 2000d, and 7 U. S.C. § 341 et seq. Subject matter jurisdiction arises from 28 U.S.C. §§ 1331, 1343(3) and (4), 1346 and 1361. The plaintiffs are all Negro citizens of the State of Alabama and include a Negro employee of the Alabama Cooperative Extension Service (ACES), and Negro farm operators and other rural residents who are beneficiaries or potential beneficiaries of extension services in the State of Alabama; they represent classes of Negro employees of ACES, Negro members or potential members of 4–H and Home Demonstration Clubs, and all Negroes who are allegedly denied equal services or excluded from positions in the operation of ACES.

The complaint seeks relief against Harry M. Philpott, as President of Auburn University; Dr. Fred R. Robertson, as Vice-President for Extension of Auburn University and as Director of the ACES; the Board of Trustees of Auburn University; and the Board of Revenue (or Board of Commissioners) of each Alabama County.

Upon plaintiffs' motion, the complaint was dismissed as to Secretary of Agriculture Hardin and Administrator of the Federal Extension Service Edwin L. Kirby. Simultaneously the Attorney General of the United States, pursuant to section 902 of the Civil Rights Act of 1964,[1] filed a certificate to the effect that the case was of general public importance. Accordingly, the United States sought and was granted intervention as a party plaintiff.

The thrust of the plaintiffs' complaint is: (1) that ACES has provided and continues to provide its services on a racially segregated and discriminatory basis; (2) that the ACES has discriminated and continues to discriminate against Negroes in hiring and promotion and in the terms and conditions of employment; (3) that the ACES has maintained and continues to maintain racially segregated 4–H and home demonstration clubs; and (4) that the ACES discriminated against plaintiff Strain solely on the basis of race in the filling of the position of Chairman of the Division of Information of the ACES.

The case is now submitted upon the several issues formulated by the pleadings, the evidence and the briefs. The evidence consists of extensive exhibits and depositions offered in support of and in opposition to the respective contentions of the parties. This Court, as

[1]  42 U.S.C. § 2000h–2.

authorized by Rule 52, Federal Rules of Civil Procedure, now incorporates in this memorandum opinion the appropriate findings of fact and conclusions of law.

I

Auburn University, formerly Alabama Polytechnic Institute, is a land-grant university located in Auburn, Alabama. On January 29, 1915, it was designated by the Alabama Legislature as the land-grant college to receive state and federal funds for the operation of a cooperative extension service in the State of Alabama. In order to qualify for federal funds for extension work, the State of Alabama must provide matching funds. All 67 counties in Alabama also contribute funds for the operation and maintenance of extension services.

The Alabama Cooperative Extension Service is the state administrative agency which carries the responsibility for the execution and coordination of cooperative services in the State. At the apex of the agency in title and authority is the State Director who is responsible to the President of Auburn University and its Board of Trustees for the complete and comprehensive administration of the ACES. This position has always been filled by a white person.

The parties have stipulated that prior to June 7, 1965, ACES provided and maintained a dual system of services and benefits which was constructed on a racial basis. Thus, there was a white extension service and a similarly structured, but entirely separate, extension service for Negroes. Each branch served a clientele almost exclusively of its same race.

The Negro branch of the ACES was headquartered in Tuskegee and had county offices in 35 counties from at least 1960 to 1965. There have been 30 counties since 1960 which never had a Negro county office and which have not had a Negro professional on the county staff from 1965 to the present.

For the purposes of administering its programs, the Negro branch divided the state in half, which resulted in a Northern district, comprising the northern half of the state, and a Southern district, comprising the southern half of the state.

Heading the entire Negro branch was the position of "State Leader for Negro Extension Work." The Negro occupying this position was responsible directly to the Director for the over-all administration of the extension programs conducted by Negro personnel for Negro farmers, homemakers and youth. His responsibilities included making recommendations to the director with regard to the hiring, assignment, promotion, transfer, discipline, discharge and salary increases for all Negro personnel. Final decisions on all personnel matters regarding Negro employees were made by the Director.

Directly responsible to the State Leader for Negro Extension Work were the two Negro District Agents and the two Negro District Home Demonstration Agents. The Negro District Agent, which by custom was a male position, was responsible for the administration of Negro extension farm programs and 4-H programs for Negro boys in his district and also for general supervision of Negro male personnel in his district. Although the Negro District Agent had the duty of seeking qualified Negro males to work in the Negro branch and recommending them to the State Leader, the actual appointment of the Negro personnel was made by the Director. Existing policies gave the Negro District Agent no authority or responsibility for contacting county governing bodies for appropriations or other matters relating to extension programs. This authority and responsibility was delegated to the white District Agent.

The Negro Home Demonstration Agent, a female position, was given the task of administering the Negro Extension Home Economics programs and 4-H programs for Negro girls in her district and also was responsible for general supervision of Negro female personnel in her district. She sought qualified Ne-

gro females for work within the Negro branch, but, as in the case of the Negro District Agent, had no role in their actual appointment.

At the county level were the Negro County Agents and the Negro Home Demonstration Agents. As with their district counterparts, these positions were for males and females respectively. Each Negro County Agent was responsible for developing programs and Plans of Work in his county as applicable to Negro men and boys in conjunction with Negro County Extension Councils. The Negro County Agents also had primary responsibility for implementing the Plan of Work as it applied to Negro farmers and Negro boys in 4–H clubs. Some agents had the additional responsibility of supervision over a Negro Assistant County Agent.

The Negro Home Demonstration Agents were responsible for developing programs and Plans of Work in their counties which applied to Negro homemakers and girls in conjunction with Negro County Extension Councils. They also had primary responsibility for the implementation of the Plan of Work regarding Negro homemakers and girls.

In addition to the Negro positions described above which were responsible for line functions in the Negro branch, there were also several Negro staff positions which were responsible for assisting the State Leader for Negro Work in meeting his responsibility of over-all coordination of Negro work and personnel. The persons holding these positions were located in Tuskegee.

Thus, while Negroes were without final authority so far as hiring, promotion or terms and conditions of employment within their own branch, it is clear that some of them did hold positions of supervision and had the responsibility of administration within their branch.

The white branch of the ACES, which had divided its responsibility among four districts within the state, had the same relative structure as did the Negro branch. Its personnel were similarly denominated with the exception of not having the adjective "Negro" before their titles and had similar areas of accountability.

As a result of the passage of the Civil Rights Act of 1964 [2] and the possibility of losing federal funds, the Auburn Board of Trustees adopted Resolution No. 4 on June 7, 1965, which eliminated the Negro branch and merged its personnel into the main branch of ACES. The resolution, which became effective July 1, 1965, changed the titles of various positions, thus reflecting the elimination of the Negro branch.[3]

Both prior and subsequent to the merger, the highest position in the ACES was that of State Director. He remained responsible to the President of Auburn and its Board of Trustees for the service's administration.

Directly below the Director in supervisory and operational authority is the Associate Director who acts as Director in the latter's absence. The Associate's duties include the supervision of the state men's staff, including District Extension Chairmen and Specialists, and coordination of travel schedules of specialists in cooperation with the District Chairmen.

For staff assistance the Director has, among others, two "Assistant Directors" and two "Assistants to the Director." Each of these staff administrators operates in the limited area of responsibility which has been delegated to him or her by the Director.

Of these six positions, only one is or ever has been occupied by a non-white Dr. William Bailey Hill, a Negro, is one of the Assistants to the Director. The parties agree, however, that Dr. Hill, who served as State Leader for Negro Work from 1949 until the merger in 1965, does not have any supervisory or

2. 42 U.S.C. § 2000a et seq.

3. Attached to this opinion is an appendix which graphically illustrates the ACES structure before and after this merger.

administrative responsibility in his present position.

In the line of supervisory and operational authority under the Director and Associate Director are four District Extension Chairmen. Each District Extension Chairman, which is a male position, is responsible for extension programs and extension personnel within his district and as such serves as the liaison between the Director and County Extension personnel. This particular job classification was created by Resolution No. 4 and replaced the title of District Agent which was abolished. All four of the District Extension Chairmen are white.

The Associate District Extension Chairman, which is a female position, is the second most authoritative person in the district and assumes responsibility for the District Extension Chairman in his absence. The Associate District Extension Chairman is responsible to the Assistant Director for Women's Work and the Director for the supervision of the women's and girls' phase of the extension program in her designated area. This job title was also created by Resolution No. 4 and replaced the position of District Home Demonstration Agent which was abolished. All four of the Associate District Extension Chairmen are white.

Next in line of authority below the District and Associate District Extension Chairmen are the County Extension Chairmen and the Associate County Extension Chairmen. The County Extension Chairman, which is a male position, has charge of extension work in the county and is directly responsible to his district chairman and the Director. There is one such position for each of Alabama's 67 counties. At the time the County Extension Chairman title was created, thus replacing the County Agent, all 67 positions were filled by whites since Resolution No. 4 trans-

ferred the new title to all those holding the position of County Agent, all of whom were white. Each vacancy in the County Extension Chairman position since the creation of the job title in 1965 has been filled by a white person.

The Associate County Extension Chairman, which is a female position, is the second most authoritative person in the county and is responsible to the Associate District Extension Chairman and the Director. She serves as County Extension Chairman in the Chairman's absence and cooperates with him in the organization, development, and implementation of programs and plans of work. Resolution No. 4 also created this title and eliminated the title of County Home Demonstration Agent. Since there is one Associate County Extension Chairman in each county, there were 67 such positions filled by virtue of the resolution. All of the Associate County Extension Chairmen were white because all the County Home Demonstration Agents were white.

At the present time 64 Associate County Extension Chairmen positions are filled by white women, 2 by Negro women and there is one vacancy. On September 1, 1968, Carolyn Brown Williams, a Negro, was appointed to the position for Macon County. Since the commencement of this litigation, Mrs. Evelyn Blackmon has been appointed as Associate County Extension Chairman for Greene County.[4]

The position of Extension Farm Agent is a male professional position which operates in the County Extension Office. The agent is directly responsible to his County Extension Chairman and works under the supervision of the county chairman and the District Extension Chairman. The job of Extension Farm Agent was also created by Resolution No. 4 and replaced the positions of Associate County Agent, Assistant

4. Advance census reports indicate that the Negro population of Macon County represents 80% of the total population. Greene County has a Negro population amounting to 75% of the total population.

County Agent, Negro County Agent and Assistant Negro County Agent.

As of March, 1970, there were 37 black men holding the position of Extension Farm Agent out of a total of 153 such positions. These black male agents are located in 34 of the 67 Alabama counties. These 34 counties represent 34 of the 35 counties that had a Negro county office prior to the merger.

The position of Extension Home Agent is a female professional position in the County Extension Office. The home agent is directly responsible to her Associate County Extension Chairman and works under the supervision of the associate chairman and the Associate District Extension Chairman. Resolution No. 4 also created this job title which replaced the positions of Associate Home Demonstration Agent, Assistant Home Demonstration Agent and Negro Home Demonstration Agent. As of March, 1970, there were 34 black women holding the position of Extension Home Agent out of a total of 103 such positions. These 34 Negro home agents were located in the same 34 counties which had a Negro county office from 1960 to 1965.

The statement of duties stipulated to by the parties indicates that the positions of Extension Farm Agent and Extension Home Agent are those which provide services directly to the clientele. While they may have contact with and provide guidance for 4–H and homemaker clubs, these positions apparently have no supervisory or administrative responsibility within the ACES itself.

## II

As already indicated, when the systems were merged, the State Leader for Negro Extension Work, who had held this position of high responsibility since 1949, was assigned to one of the positions of Assistant to the Director. This new position is wholly without supervisory or administrative responsibility. The two Negro District Agents were appointed to the newly created position of District Agent; and while this previous job classification had had authority over the county officers within the Negro branch, the new position has no administrative or supervisory responsibility. The Court notes as significant that the two Negro District Agents, each of whom had 17 years' experience and outstanding qualifications, left the ACES in 1965. While it is not certain that either of their departures was the result of the complete lack of personnel authority in the new posts to which they were to be assigned, such an inference is indicated.

A similar fate awaited the Negro women at the district level. Both of these employees were shunted into job classifications without supervisory responsibility.

Persons holding the County Agent and Home Demonstration Agent position, which could only be held by a white person under the dual system, automatically (by virtue of the title change) became County Extension Chairmen and Associate County Extension Chairman respectively. The allegation of the plaintiffs that this change was made without regard to these persons' job tenure, ability, job effectiveness or educational background is in effect uncontroverted. This Court specifically finds that this was the case.

In a similar fashion, the Negro County Agents and Negro Home Demonstration Agents automatically became Extension Farm Agents and Extension Home Agents regardless of their tenure, ability, job effectiveness or educational background. The effect of these changes was a demotion for the Negro employees since they now have less job responsibility and also must report to the white persons (the County and Associate County Extension Chairmen) who had been their job counterparts prior to the enactment of Resolution No. 4. While Negro agents were demoted by virtue of Resolution No. 4, white agents were either not affected or received increased responsibilities. Thus, the stipulated and uncontroverted facts affirmatively reflect, and this Court specifically finds,

that the purported merger of the ACES' dual systems in 1965 has thoroughly and effectively perpetuated and to a substantial degree aggravated the racial discrimination which existed previously.

### III

In addition to the discrimination involved in the change of job classifications resulting from the merger, the plaintiffs have alleged that various other practices and policies have contributed to the racial discrimination within the ACES.

One such procedure is the requirement that the names of three qualified persons be advanced to the county governing body, the county commissioners, whenever a vacancy at the county level of the extension service is to be filled. The previous practice was to recommend only one person for each such vacancy.

The change in procedure was implemented on May 19, 1969. Less than one year prior to that modification, the Director of ACES, in a signed statement to a special agent of the Department of Agriculture, had stated that "it is questionable whether many of the counties would approve the appointment of a Negro." Thus, while he had serious reservations as to the racial objectivity of most county governing bodies, the Director implemented a system of approval which made it significantly easier for the counties to fail to hire qualified Negroes. The Court finds that the action of ACES, providing the counties with three choices for each vacancy, was designed to achieve and has resulted in racially discriminatory hiring on the county level.

The plaintiffs have alleged a further practice by which the ACES has permitted substantial discrimination by the counties. Whether through their County Commissioners, or some other county governing body, a few counties in the state send their county salary contributions directly to the employees. The evidence affirmatively indicates and this Court finds that the county components of the ACES employees' salaries reflect substantial differentials which can be explained only by the factor of race.

In his deposition the Director states that he did not seriously consider the appointment of any Negro personnel to the newly created district and county chairmanships because "they [the Negro personnel] didn't have the training in technical agriculture that is required, to communicate effectively with the Experiment Station people at the State, Federal or National level, or among other states." The Director then expressed the view that the only school in Alabama which could provide this necessary technical background was Auburn University. By using this criterion, the Director effectively eliminated all Negro employees from consideration in a less than subtle fashion since Auburn excluded Negro students until 1964. See Franklin v. Parker, 223 F.Supp. 724, 727 (M. D.Ala.1963), modified and aff'd, 331 F. 2d 841 (5th Cir. 1964). Thus, the Court finds that at the time of the merger in 1965, Negroes were denied positions of responsibility within the ACES because they lacked an educational background which was refused them because of their race. Even today, had a Negro begun work at Auburn at the first opportunity, that is in 1964, and completed the appropriate bachelor's and master's degree programs in the minimum time, he would still lack sufficient length of service with ACES to warrant serious consideration.

In addition to employing a discriminatory selection technique and establishing an educational criterion which Negroes would need several years in attaining, plaintiffs allege that defendants willfully withheld information as to vacancies in order that favored whites would be the only applicants. Plaintiffs cite as a primary example the case of Alex Brown, a Negro agent in Dallas County, who has for many years maintained a keen interest in and high qualifications for the audio-visual field. Defendants do not contest that although Mr. Brown

had noted his special interest to his District Chairman, this information was not forwarded to the Director when a vacancy in the audio-visual area occurred. Thus, the Director stated, after having appointed another to the vacancy, that he had very high regard for Mr. Brown but did not know of his interest.

The evidence presented in this case is not sufficient to demonstrate that either the District Chairman or the Director willfully or intentionally neglected to make or failed to take account of any recommendations concerning Mr. Brown. The evidence, however, is clear that vacancies have been filled without their being made known to all ACES personnel and to the public at large; the practice has had a racially discriminatory effect.

The plaintiffs further allege that in the terms and conditions of their employment they have also suffered disadvantages because of their race. For example, they contend that their assignments to counties and to subject matter areas have been the result of calculated racial considerations. The Negroes employed at the county level before the merger have all been assigned to the counties they served previously. Thus, those 30 or more counties which did not have Negro professionals before the merger are still without them. The effect of this policy has been to lock all Negro employees into the clientele patterns that existed under the dual system. Naturally this arrangement has a similar effect upon the white ACES personnel who continue to serve substantially the same patrons as they did before 1965.

This situation perpetuates yet another invidiousness of this system since ACES requires its personnel to comply with clients' requests for a specific agent. Since agents of ACES dealt only with clients of the same race before 1965, and since the merger has not affected the placement of ACES personnel within the various counties, the evidence reflects that clients of ACES request only agents of the same race because these are the only ones with whom the clients are familiar. The Negro clients are denied the expertise of the white agents and the white clients are denied the skills of the Negro agents. Accordingly, this Court finds that the county assignment practices of ACES have had and continue to have a racially discriminatory effect.

A practice which has further perpetuated the abuses of the ACES' discriminatory policies has been the assignment of Negroes to a limited number of subject matter areas and their virtual exclusion from certain categories. The defendants have not challenged the assertion of the plaintiffs that Negroes are almost totally denied access to areas such as beef cattle and dairying. Instead, Negroes are systematically assigned to areas with almost exclusively low-income farmer contact. The Court finds that the subject matter area assignment practices of the ACES are racially motivated and racially discriminatory.

Finally, the restriction of Negro personnel to the counties in which they served before the merger, has had the effect of limiting the number of Negroes in subordinate positions at the county level. Thus, all 18 Negro clerical personnel employed by the ACES are assigned to counties in which there is also a Negro professional. Not a single Negro secretary has been assigned to work in an all-white county office in the years since the merger. This practice is clearly a result of racial discrimination.

IV

■■ It is now well established in our jurisprudence that those state classifications are considered as suspect which tend to single out adversely a group which has been found to be traditionally in need of judicial protection. Racial classifications are among those most clearly stated as falling into the suspect category. See McLaughlin v. Florida, 379 U.S. 184, 192, 85 S.Ct. 283,

13 L.Ed.2d 222 (1964); Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Korematsu v. United States, 323 U.S. 214, 216, 65 S. Ct. 193, 89 L.Ed. 194 (1944). "At the very least, the Equal Protection Clause demands that racial classifications, * * * be subjected to the 'most rigid scrutiny', Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944), and, if they are ever to be upheld, they must be shown to be necessary to the accomplishment of some permissible state objective, independent of the racial discrimination which it was the object of the Fourteenth Amendment to eliminate." Loving v. Virginia, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed. 2d 1010 (1967). Accordingly, in order to pass constitutional muster it is necessary that whatever racial discrimination flows from the state's conduct, whether in its purpose or effect, must be required to achieve a valid state goal. See Dandridge v. Williams, 397 U.S. 471, 485 n. 17, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Finally, it is appropriate to examine the official conduct in light of its historical context. See Reitman v. Mulkey, 387 U.S. 369, 373, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); United States v. International Association, etc., of Iron Workers, Local No. 1, 438 F.2d 679, 683 (7th Cir. 1971).

## V

■ Upon these findings, viewed in light of the appropriate legal principles, this Court concludes that there is absolutely no valid justification whatsoever for the various discriminatory practices engaged in by the defendants. With reference to the placement of Negro employees who had held supervisory positions under the dual system in classifications which are totally devoid of personnel responsibility, the conduct of those defendants who participated in the creation of this structure is violative of the Equal Protection Clause. Additionally, there is no necessity for the continuation of the three-name recommendation procedure.

■ The Court further concludes that the record presently before it is insufficient to justify the ACES requirement that positions of the County Extension Chairman and above be filled by personnel with a technical background in agriculture from Auburn University. In addition to the fact that it is not clear that Auburn is the only school within the state providing adequate training, one state agency may not rely in its policies and practices upon the deficiencies caused by another state body. Cooper v. Aaron, 358 U.S. 1, 15–17, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). Nor is there any valid state interest in failing to announce vacancies in order that qualified personnel might apply.

Finally, the Court concludes that there is no valid legal reason for the state to assign its Negro employees to the counties which have traditionally had Negro offices and to assign these employees to subject matter areas dealing primarily with low-income farming. Therefore, such conduct of the defendants is unconstitutional.

■ Under such circumstances as exist in this case, the courts have the authority and the duty not only to order an end to discriminatory practices, but also to correct and eliminate the present effects of past discrimination. Hutchings v. United States Industries, Inc., 428 F.2d 303, 310 (5th Cir. 1970); Local 53, Etc., Asbestos Workers v. Vogler, 407 F.2d 1047, 1052 (5th Cir. 1969).

The racial discrimination in this case has so permeated the employment practices and services distribution of the defendants that this Court finds it necessary to enter a detailed and specific decree which will not only prohibit discrimination but which will also prescribe procedures designed to prevent discrimination in the future and to correct the effects of past discrimination. A decree will be entered accordingly.

APPENDIX

ACES Structure Immediately Following Merger

ACES Structure Prior to Merger

-------- Change in position resulting from merger

———— Line of authority